1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  PATRICK J. COUGHLIN (111070)
   DAVID W. MITCHELL (199706)
3  BRIAN O. O'MARA (229737)
   STEVEN M. JODLOWSKI (239074)
4  CARMEN A. MEDICI (248417)
   655 West Broadway, Suite 1900
5  San Diego, CA  92101
   Telephone:  619/231-1058
6  619/231-7423 (fax)
   patc@rgrdlaw.com
7  davidm@rgrdlaw.com
   bomara@rgrdlaw.com
8  sjodlowski@rgrdlaw.com
   cmedici@rgrdlaw.com
9
   ROBBINS ARROYO LLP
10  BRIAN J. ROBBINS (190264)
   GEORGE C. AGUILAR (126535)
11  GREGORY DEL GAIZO (247319)
   600 B Street, Suite 1900
12  San Diego, CA  92101
   Telephone:  619/525-3990
13  619/525-3991 (fax)
   brobbins@robbinsarroyo.com
14  gaguilar@robbinsarroyo.com
   gdelgaizo@robbinsarroyo.com
15
   Attorneys for Plaintiffs
16
   [Additional counsel appear on signature page.]
17
                    UNITED STATES DISTRICT COURT
18
                   SOUTHERN DISTRICT OF CALIFORNIA
19
20  J THOMPSON and WILLIAM P.        )  Case No.   '16CV2552 LAB KSC
   DUNCANSON, Individually and on    )
21  Behalf of All Others Similarly Situated, )
                                     )  CLASS ACTION
22                        Plaintiffs, )
                                     )  COMPLAINT FOR VIOLATIONS OF
23           vs.                     )  THE SHERMAN ANTITRUST ACT
                                     )  AND CALIFORNIA'S
24  1-800 CONTACTS, INC., VISION     )  CARTWRIGHT ACT AND UNFAIR
   DIRECT, INC. and DOES 1-15,       )  COMPETITION LAW
25                                   )
                         Defendants. )
26  _____ )  DEMAND FOR JURY TRIAL
27
28

1   Plaintiffs J Thompson and William P. Duncanson ("plaintiffs") hereby bring
2   this action for damages and other relief against defendants 1-800 Contacts, Inc. ("1-
3   800 Contacts" or the "Company"), Vision Direct, Inc. ("VisionDirect") and Does 1-15
4   (collectively "defendants") for violations of the Sherman Antitrust Act (15 U.S.C.
5   §§1-3), and California's Cartwright Act (California Business & Professions Code
6   §16700, *et seq*.) and Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code
7   §17200, *et seq*.).  Plaintiffs make all allegations upon information and belief except as
8   to those paragraphs that are based on plaintiffs' personal knowledge.

9   **THE CONSPIRACY**

10   1.   Plaintiffs bring this action on behalf of all direct-to-consumer purchasers
11   of contact lenses, including those who purchased contact lenses online, in the United
12   States and a subclass of all California residents against defendant 1-800 Contacts as
13   the ringleader behind a scheme to prevent competition in the online market for contact
14   lenses and against 1-800 Contacts' currently unnamed co-conspirators, Does 1-15.
15   This action arises out of defendants' overarching scheme to restrain competition in the
16   direct-to-consumer and online markets for contact lenses.

17   2.   As recently revealed in a complaint by the Federal Trade Commission
18   ("FTC"), 1-800 Contacts is the instigator and enforcer of an unlawful series of
19   agreements between 1-800 Contacts and at least 14 of its "competitors" to divide up
20   the direct-to-consumer and online markets for sales of contact lenses.  These 15
21   "competitors" combine to control over 50% of the direct-to-consumer and online
22   markets for contact lenses.  1-800 Contacts accounts for over 50% of the online
23   market by itself.  In particular, 1-800 Contacts abused its monopoly power and entered
24   into bilateral agreements with each of its competitors/co-conspirators to not bid
25   against each other in advertising auctions conducted by internet search engines.

26   3.   Due to the massive amount of information available on the internet,
27   internet search engines have become indispensable to anyone seeking to use the
28   internet.  Internet search engines are generally simple to use – a user need only enter

keywords, such as "contact lenses," into a field and the search engine will use an algorithm to find and list the webpages that are responsive to the query, usually ranked in order of relevance. Search engines, such as Google or Bing, are usually free to users. The main source of revenue for these search engines is the advertising they sell, which appears in response to a user's search and is displayed adjacent to the respective search engine's organic results. This form of advertising has a proven track record of being successful, as it allows the advertisers to market directly to consumers at the very moment they are looking to make a purchase or have expressed an interest in a specific subject. Online search engine advertising is critical to nearly every company's ability to compete in the digital age. Google and Bing sell this advertising through automated auctions.

4.     A successful way for competitors to raise awareness of their products and compete for sales is to purchase search advertising that mentions their competitors, especially as a comparison. For example, if a consumer is looking to buy a television for the cheapest price and knows a big retailer like Best Buy sells televisions, the consumer might search for "cheaper than best buy for tvs." Such a search will likely yield sponsored ads by Best Buy, but also ads by competitors, such as Walmart.

5.     This is not the case in the contact lenses industry. A search of "cheaper than 1-800 contacts for contact lenses" yields sponsored advertising by only one company, 1-800 Contacts. The reason for this disparity is that anticompetitive bilateral agreements between 1-800 Contacts and its co-conspirators prevent each other from bidding on any search keywords or phrases with the other company's brand names, websites or trademarks in them. In addition, the agreements require that 1-800 Contacts and its co-conspirators use "negative keywords." This is an instruction to the search provider that a company's advertisement ***should not*** appear in response to a search query that contains a particular term or terms. Normally negative keywords are used to prevent advertising appearing from irrelevant queries that may contain similar words. For example, a company that sells billiards accessories would

bid for the term "pool" in order to advertise for pool sticks, but use a negative keyword of "swimming" to prevent its ads from appearing when someone is looking for water-related accessories.  While many companies use negative keywords to properly tailor advertisements to interested consumers, defendants use negative keywords to allocate the market for contact lenses.  1-800 Contacts and its co-conspirators agreed to instruct search advertisers that their advertising should not appear when a search includes a competitor's trademark through the use of negative keywords.

6.     The 1-800 Contacts-led scheme has been ongoing for more than a decade.  In 2003, there was an estimated $200 million worth of online contact lens sales.  Though 1-800 Contacts accounted for $187 million worth of those sales, the Company realized that it was beginning to have real competition for direct sales.  1-800 Contacts thereafter devised a plan to unlawfully stifle online competitors so that it could continue to sell contact lenses at higher prices than its rivals without losing market share.  Specifically, in order to restrict competition and maintain its market share and pricing, 1-800 Contacts began accusing its then competitors of trademark infringement if a rival's advertisement appeared on the search results page in response to internet search queries that involved 1-800 Contacts' brand name, websites or trademarks.  1-800 Contacts' position was legally baseless and a transparent threat to inundate its competitors with prolonged and costly litigation.

7.     Between 2004 and 2013, fourteen of 1-800 Contacts' competitors agreed with 1-800 Contacts not to bid against 1-800 Contacts in certain auctions in order to settle the sham lawsuits or threat thereof.  Most of the competitors agreed to 1-800 Contacts' terms before even asserting counter claims.  The agreements – ***which are reciprocal*** – prevented 1-800 Contacts and its competitors from bidding in search advertising auctions for any of the others' trademarked terms and common variations, including common misspellings, of any of those terms.  Each competitor knew that by entering into this agreement, its market share and profits would be protected.  Of

1  course, to ensure this was the case, all a competitor needed to do was a Google search.

2  In addition, 13 of the agreements called for the adoption of negative keywords.  Only

3  one competitor, Lens.com, refused to enter into an agreement.  1-800 Contacts and

4  Lens.com proceeded to litigate 1-800 Contacts' bogus trademark claim, and after

5  years of litigation, Lens.com prevailed.  The district court in that action specifically

6  called the practice of seeking agreements that preclude a competitor's advertisements

7  from appearing on a search results page any time its mark is entered as a search term

8  "an anti-competitive, monopolistic protection to which [1-800 Contacts] is not

9  entitled."[1]  Notably, in its answer to the FTC action, 1-800 Contacts admitted that it

10 entered into these agreements with competitors in all but one case to allegedly resolve

11 threatened or actual trademark litigation.

12      8.      Members of the Class and the California Subclass (as defined herein)

13 were injured by defendants' actions.  First, the members of the Class and California

14 Subclass paid supracompetitive prices for contact lenses.  Indeed, the impetus for 1-

15 800 Contacts' scheme was to suppress competition to protect the margins the

16 Company traditionally enjoyed before competition entered the marketplace.

17      9.      In addition, defendants' actions prevented the Class and California

18 Subclass from receiving the benefits of a fair and competitive marketplace for both

19 information and pricing of contact lenses sold directly to consumers, including online.

20 Because of the unlawful agreements, competitors could not advertise against 1-800

21 Contacts, and  therefore  customers  did  not  receive  information  concerning

22 competitors' products and pricing.  Because of these agreements, 1-800 Contacts

23 continued to give the impression that it was a low-cost provider of contact lenses,

24 shielding the public from information that would have driven the price of contact

25 lenses down.

26

27 _____

[1]  *1-800 Contacts, Inc. v. Lens.com, Inc.*, 755 F. Supp. 1151, 1174 (D. Utah 2010),

28 *aff'd in part and rev'd in part on other grounds*, 722 F.3d 1229 (10th Cir. 2013).

10.     Thus far, defendants' scheme has worked, at least for 1-800 Contacts. 1-800 Contacts was able to carve up the direct-to-consumer market for contact lens sales and prevent the dissemination of its competitors' advertisements, allowing it to continue to sell contact lenses at supracompetitive prices.  During the relevant time period, 1-800 Contacts has consistently been the highest priced seller of the most popular contact lenses.  Despite charging more (in some cases substantially more) than its competitors, 1-800 Contacts has retained its dominant market position.  In a competitive marketplace, absent 1-800 Contacts' action and its competitors' agreement to the scheme, accurate and fulsome information would have driven prices down.

## VENUE AND JURISDICTION

11.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1711, *et seq*., which vests original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount in controversy exceeds $5 million and where the citizenship of any members of the class of plaintiffs is different from that of any defendant.    The $5 million amount in controversy and diverse-citizenship requirements of CAFA are satisfied in this case.

12.     The Court has personal jurisdiction over each of the defendants because, *inter alia*, each of the defendants: (a) transacted business throughout the United States, including in this District; (b) sold billions of dollars in and provided services related to contact lenses throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

13.     Defendants engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

14.     The activities of defendant 1-800 Contacts and its co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.  Defendants' products and services are sold in the flow of interstate commerce.

15.     The anticompetitive conduct, and its effects on U.S. commerce described herein, proximately caused antitrust injury to plaintiffs and members of the Class and the California Subclass in the United States.

16.     By reason of the unlawful activities alleged herein, defendants substantially affected commerce throughout the United States, causing injury to plaintiffs and members of the Class.

17.     Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States, including plaintiffs and members of the Class and the California Subclass.

18.     Venue is proper in this District pursuant to §12 of the Clayton Act (15 U.S.C. §22) and 28 U.S.C. §1391(b)-(d), because a substantial part of the events giving rise to plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District, and one or more of the defendants resides in, is licensed to do business in, is doing business in, had agents in, or is found or transacts business in, this District.

## PARTIES

19.     During the Class Period (as defined below), plaintiff J Thompson ("Thompson") purchased contact lenses directly from 1-800 Contacts through its website.  Plaintiff Thompson purchased these lenses at supracompetitive prices, and was injured thereby.  Plaintiff Thompson is a resident of San Diego, California.

- 6 -

20.     During the Class Period, plaintiff William P. Duncanson ("Duncanson") purchased contact lenses directly from 1-800 Contacts through its website.  Plaintiff Duncanson purchased these lenses at supracompetitive prices, and was injured thereby.  Plaintiff Duncanson is a resident of San Francisco, California.

21.     Defendant 1-800 Contacts is a corporation organized, existing, and doing business under and by virtue of the laws of the United States, with its principal place of business located at 261 West Data Drive, Draper, Utah 84020.  1-800 Contacts sells contact lenses and related products over the internet and by telephone throughout the United States, including to California residents.

22.     Defendant VisionDirect is a leading online retailer of contact lenses and vision care supplies.  The Bellevue, Washington-based company offers a full line of bestselling products like Acuvue®, Bausch & Lomb®, CIBA Vision®, and CooperVision®, plus specialty brands and lenses.  VisionDirect was founded in 2000 and has since shipped over 8 million orders.  In 2003, VisionDirect was acquired by drugstore.com®, and in 2011, it became part of the Walgreens group of companies.

23.     The true names and capacities of defendants sued herein as Does 1 through 15, inclusive ("Doe Defendants"), are presently not known to plaintiffs, who therefore sue these defendants by such fictitious names.  Plaintiffs will seek to amend this complaint and include these Doe Defendants' true names and capacities when they are ascertained.  Each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by the Class and California Subclass.

### THE MARKET FOR CONTACT LENSES

**The Relevant Markets**

24.     Plaintiffs first plead a relevant market for antitrust purposes as the market for direct-to-consumer sales of contact lenses.   This includes both online and telephone sales of contact lenses to consumers ("direct-to-consumer").  Because of the ease of purchasing contacts without going to a physical store, the traditional retail

market for contacts exists separately, and is not a substitute for online and telephone sales. A small but significant increase in the price for online contacts would not drive consumers to purchase contacts in a retail store. Alternatively, the relevant market for antitrust purposes is only online sales. Discovery and expert testimony may reveal that online sales and telephone sales are not close economic substitutes. As detailed below, the traditional retail sale of contact lenses exists in a different market. The relevant geographic market is the United States. Regardless of whether the market is defined as direct-to-consumer or online sales only, 1-800 Contacts has a significant enough market share to exert market power.

25. A contact lens is a lightweight, corrective, cosmetic or therapeutic device that is usually placed directly onto the cornea of the eye. Contact lenses have many benefits for wearers, including appearance and practicality.

26. Contact lenses are considered medical devices by the United States Food and Drug Administration (the "FDA"). Accordingly, the FDA regulates the manufacture, distribution and sale of contact lenses in the United States.

27. In addition, in 2003, Congress enacted the Fairness to Contact Lens Consumers Act, 15 U.S.C. §§7601-7610. Pursuant to this act, the FTC promulgated rules concerning the sale of contact lenses with the intention of increasing competition for the sale of contact lenses (the "Contact Lens Rule"). The Contact Lens Rule places certain restrictions on how contact lenses can be sold. Most notably, the Contact Lens Rule requires sellers to only sell to customers who have a valid prescription and can confirm the accuracy of the prescription.

28. The U.S. Centers for Disease Control and Prevention estimates that there are approximately 40.9 million contact lens wearers in the United States aged eighteen years and older, or approximately 16.7% of the adult population.

29. The markets for direct-to-consumer and online sales of contact lenses are distinct from the traditional brick and mortar market. Direct-to-consumer contact lens sellers are able to sell contact lenses anywhere in the United States that receives mail.

Online contact lens sellers provide the consumer the convenience of being able to order contacts from any location without having to find a brick and mortar store selling their needed type of contact lenses.  According to data from Bain Capital regarding the future of independent optometry, in 2012 an estimated 20% of contact lens sales occurred online.  That number has since increased.

30.    In contrast to direct-to-consumer sales of contacts, retailers in the traditional market operate from physical storefronts or professional offices, maintain an eye-care professional on-site to examine and fit their customers, and issue contact lens prescriptions.  Traditional retailers do not set their prices based upon direct-to-consumer prices.  According to an economist with the FTC who examined online and offline prices for contact lenses, "[O]ffline firms set prices on the assumption that most of their customers are unaware of online prices." *See* James C. Cooper, *Prices and Price Dispersion in Online and Offline Markets for Contact Lenses,* FTC Bureau of Economics Working Paper (Nov. 29, 2006).

**The Demand for Contact Lenses Is Inelastic**

31.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "elastic" if an increase in the price of a product results in diminished revenues, with declines in the quantity sold of that product outweighing the effects of higher prices.  For products with a highly elastic demand, customers have many feasible alternatives for cheaper products of similar quality and decrease purchases sharply in the face of even a small price increase.  Here, the demand for contact lenses is inelastic.

32.    Markets with lower elasticity facilitate collusion, allowing producers to raise their prices without triggering customer substitution and sufficient lost sales revenues as to offset the beneficial effect of higher prices on profits for products they still continue to sell.

33.    There is only one other medical device that provides some of the same benefits as contact lenses – eyeglasses.  Many people choose to wear contact lenses as

opposed to eyeglasses because they do not steam up, they provide a wider field of vision, and they are more suitable for a number of sporting activities.  In addition, some people find wearing contact lenses more aesthetically pleasing than eyeglasses. Contact lenses also have the ability to alter the color of a user's eye and can be used solely for cosmetic purposes.  Contact lens manufacturers, distributors, online sellers, brick and mortar retailers and consumers do not compare the price of contact lenses to those of glasses.

34.     Contact lenses have a limited lifespan, and therefore a contact lens user will have to periodically purchase more contact lenses.  Contact lens users will purchase contact lenses that are good for a set amount of time and buy a certain supply of the contact lens.  Usually, the contact lens users' eye-care providers will decide the type of contact used, the strength of the contact, and whether a contact lens has to be replaced daily, weekly or monthly.  Therefore, consumers exert little choice in the particular type of contact lens they will buy.  As a result, contact lens purchasers will continue to use and acquire contact lenses even if there is an increase in price.

**The Markets for Direct-to-Consumer and Online Contact Lens Sales Are Highly Concentrated**

35.     1-800 Contacts has dominated the market for direct-to-consumer sales of contact lenses since it was founded in 1995.

36.     In 1999, orders of contact lenses in the direct-to-consumer market, as opposed to the brick-and-mortar or traditional market, began to shift from over-the-phone sales to sales through online channels.

37.     Since then, sales of contact lenses through the internet have increased due to the ease and convenience of ordering contacts online, among other factors.  For instance, a contact lens user can order new contact lenses online, even if they have recently moved and have yet to find a new eye-care provider.  Indeed, this is the exact scenario that happened to plaintiff Thompson, which led to his first purchases from 1-800 Contacts.

38.     1-800 Contacts is by far the most dominant company in direct-to-consumer and online contact lens sales, accounting for between 50%-55% of the market since 2005. Collectively, 1-800 Contacts and the fourteen companies that it entered into the illegal bilateral agreements with account for over 80% of the market for online contact lens sales.

**ANTICOMPETITIVE CONDUCT BY THE DEFENDANTS**

39.     Defendants are horizontal competitors.

40.     The conspiracy consisted of a continuing agreement, understanding or concerted action between and among defendants and their co-conspirators in furtherance of which defendants fixed, maintained or made artificial prices for contact lenses sold directly to consumers, including online, in the United States and to California residents by rigging search engine advertising auctions and preventing the dissemination of information to the Class and California Subclass during the Class Period. Defendants' conspiracy constitutes a *per se* violation of the Sherman Antitrust Act and the Cartwright Act and is an unreasonable and unlawful restraint of trade and an unlawful, unfair or fraudulent practice under the UCL.

41.     At all relevant times, other corporations, individuals and entities willingly conspired with defendants in their unlawful and illegal conduct. Numerous individuals and entities participated actively during the course and in furtherance of the scheme described herein. The individuals and entities acted in concert by joint ventures and by acting as agents for principals in order to advance the objectives of the scheme to benefit defendants and themselves through the manipulation of contact lens prices in the United States and sold to California residents.

**Online Advertising and Sale of Contact Lenses**

42.     Contact lens retailers such as 1-800 Contacts rely heavily on internet advertising to attract and inform consumers about their products and to direct consumers to their websites and phone representatives. The vast majority of this advertising is done through internet search engines such as Google and Yahoo!.

Internet search engines are computer programs that allow web users to search the World Wide Web for websites containing particular content.  When a search term is entered, the search engine compares the term against its databases and applies a formula or algorithm to produce a search engine results page that lists the websites that may relate to the user's search terms.  Google's search engine, for example, has a natural or organic system that lists results with the most relevant websites appearing near the top of the page.  In addition, search results pages list paid advertisements above or to the right of the organic search results.  These paid advertisements are referred to as "sponsored links."  Consumers depend on search engines to navigate the nearly unlimited amount of content on the internet.

43.    Search engine companies sell advertising space on search engine results pages by way of auction.  Advertisers bid on certain words or phrases known as "keywords."   When a user's search term matches an advertiser's keyword, a sponsored link appears for that advertiser.  The order and location of the sponsored link depends on the amount bid for the keyword and the quality of the advertisement.  According to the terms and conditions of the search engine companies, advertisers cannot pay to be listed in a specific order on the search engine results page, they can only pay for advertisements.

44.    When bidding on a keyword, an advertiser may specify whether keywords should be applied as a "broad match," "phrase match," "exact match," or "negative match."  When an advertiser designates a keyword as a "broad match," its sponsored link will appear anytime a search is conducted for that keyword, its plural forms, its synonyms, or phrases similar to the word.  When an advertiser designates a keyword as a "phrase match," its sponsored link will appear when a user searches for a particular phrase, even if the user includes other terms before or after the phrase.  When an advertiser designates a keyword as an "exact match," then its sponsored link will appear only when the exact phrase bid on is searched on Google.  In contrast, when an advertiser designates a keyword as a "negative match," the advertiser ensures

that its link will not appear when certain terms are searched.  For example, a contact lens seller may specify that its link should not appear when the phrase "contact lists" is entered.

45.     Defendants pay for advertisements on a "cost-per-click" basis. This means if a keyword generates a sponsored link, but the internet user does not click on that link, the advertiser does not pay for its link appearing on the search results page. The appearance of an advertiser's link on a user's computer is called an "impression." An advertiser selects the language used in its advertisements. The language can be important in capturing a user's attention so the user will click on the link to an advertiser's website.  An advertiser can gauge the success of an impression (and the search terms that led to that impression) by calculating how many impressions occur in comparison to the number of clicks.

46.     Search advertising is crucial to advertisers because it allows them to deliver a message to the consumer exactly when the consumer is expressing interest in a specific subject and potentially at the same time the consumer is ready to make a purchase.  In the online contact lens market, consumers rarely have preference over which particular retailer they make their purchase from.  Instead, consumers most frequently use generic search terms such as contact, contact lens and replaceable lens, and purchase based on the lowest price available for their prescription.

**1-800 Contacts' Scheme to Restrain Competition**
**and Maintain Its Dominant Market Position**

47.     1-800 Contacts was founded in February 1995 as 1-800-LENSNOW, but changed its name to 1-800 Contacts in July 1995.  Within one month of changing its name, 1-800 Contacts received 2,000 calls and produced $38,000 in revenue.  1-800 Contacts' business grew rapidly over the next few years, as it became the most dominant company in direct-to-consumer contact lens sales, including online sales.

48.     By the early 2000s, however, competitors began to enter the direct-to-consumer market for the sale of contact lenses. These competitors, like VisionDirect,

1   heavily invested in online search advertising and undercut 1-800 Contacts' prices.

2   Through lower prices, these competitors quickly grew their sales and became a serious

3   threat to 1-800 Contacts' dominant market position.

4        49.    This sparked concern at 1-800 Contacts.  In 2005, as Americans' comfort

5   with the internet and online shopping increased, in an effort to deter its competitors

6   and reduce competition, 1-800 Contacts implemented a business practice whereby it

7   conducted periodic online searches of "1-800 Contacts" and variations thereof on

8   internet search engines.   Anytime its searches returned the sponsored link of a

9   competitor, 1-800 Contacts would send a cease-and-desist letter to the competitor that

10  accused the competitor of infringing upon its trademark by purchasing a keyword

11  using 1-800 Contacts' name from the internet search engine.  But this claim was

12  incorrect.

13       50.    1-800 Contacts understood that it had no legal basis for these accusations.

14  1-800 Contacts knew that an internet search for "1-800 Contacts" would return a list

15  of links from various retailers that had acquired generic, non-infringing search terms

16  such as "contact" and "contact lens."

17       51.    Before sending the cease-and-desist letters, 1-800 Contacts did not

18  confirm that its competitors had purchased "1-800 Contacts" as a keyword.  With

19  respect to at least one competitor, Lens.com, 1-800 Contacts did not run any privacy

20  reports to determine the keywords that had generated search results containing the

21  links for the rival's website.  Rather, it simply presumed that Lens.com had purchased

22  "1-800 Contacts" as a keyword.[2]

23       52.    Indeed, in response to litigation threats, several competitors of 1-800

24  Contacts advised 1-800 Contacts that: (i) they had never used 1-800 Contacts'

25  trademark in their advertisements, and/or (ii) the use of generic keywords would

26

---

27  [2]   Whether or not it is legal to use a competitor's trade name as a search term (it
    likely is) is irrelevant.  The intent of the threatened legal action was to monopolize the
28  industry and to get 1-800 Contacts' competitors to agree to divvy up the market.

1    sometimes result in a search triggering a multitude of other contact lens sites,

2    including legitimate sponsored advertisements.  Through its counsel, one competitor,

3    Memorial Eye, specifically advised 1-800 Contacts that it had "'never used, or even

4    considered using, [1-800 Contacts'] trademark in its sponsored advertisements, or

5    even a search phase trigger.'"  1-800 Contacts nevertheless continued with its threats,

6    hoping to protect its market share and extract an anticompetitive agreement from its

7    competitors by forcing them to incur substantial cost and/or limit the keywords they

8    purchased from search engines.

9           53.    Competitors who refused to bow to 1-800 Contacts' demands concerning

10   a limitation on keywords or use of negative keywords were threatened with litigation.

11   Most of these rivals lacked the size and resources to withstand substantial litigation.

12   Between 2004 and 2013, 1-800 Contacts was able to extract at least 14 horizontal

13   agreements that restrained trade and reduced output in the relevant markets.

14          54.    All of the agreements prohibit 1-800 Contacts' competitors from bidding

15   in a search advertising auction for 1-800 Contacts' trademarked terms, as well as

16   variations thereof.  All of the agreements are reciprocal, meaning that 1-800 Contacts

17   is likewise prohibited from bidding in a search advertising auction for its competitors'

18   trademarked terms, as well as variations thereof.  This part of the agreement is market

19   allocation, a naked horizontal restraint on trade and *per se* illegal under the Sherman

20   Antitrust Act.  Additionally, 13 of the agreements require 1-800 Contacts' competitors

21   to use "negative keywords," which direct a search engine not to display the

22   competitor's advertisement in response to a search query that includes 1-800

23   Contacts' trademarked names or variations thereof.

24          55.    One such competitor who entered into an agreement with 1-800 Contacts

25   is VisionDirect.  VisionDirect sold contact lenses online at www.visiondirect.com.  It

26   entered into two horizontal agreements with 1-800 Contacts.

27          (a)    The first agreement was entered into on June 24, 2005 (the "2005

28   Agreement").  Under the 2005 Agreement, VisionDirect was prohibited from

- 15 -

1   "'causing [its] website or Internet advertisement to appear in response to any Internet

2   search for [1-800 Contacts'] brand name, trademark or URL.'" The agreement also

3   prohibited VisionDirect from "'causing [its] brand name, or link to [its] Websites to

4   appear as a listing in the search results page of an Internet search engine, when the

5   user specifically searches for [1-800 Contacts'] brand name, trademark or URLs.'"

6   On information and belief, VisionDirect, through its counsel, Wilson Sonsini

7   Goodrich & Rosati, expressed serious antitrust concerns about the enforceability of

8   the 2005 Agreement as it related to the implementation of negative keywords.  On

9   January 24, 2008, Wilson Sonsini wrote 1-800 Contacts' General Counsel:

> Separate and apart from Vision Direct's position regarding the interpretation of the contract, set forth in Ms. Caditz's November 5, 2007 letter—that is, that the Agreement does not contemplate the implementation of negative key words—Vision Direct continues to believe that any agreement between the parties with regard to the implementation of negative key words creates an unacceptable risk of violating Section 1 of the Sherman Act, and as such, represents a serious antitrust issue.  Any such agreement would appear to represent a restraint unrelated to the terms of the Agreement and unrelated to a valid intellectual property right, and one that depresses the price of key words to search companies such as Google, Yahoo! and Microsoft.

        (b)    The second agreement was entered into in 2009 (the "2009

16   Agreement").  Under the 2009 Agreement, 1-800 Contacts and VisionDirect agreed to

17   implement negative keyword lists in connection with their internet advertising efforts.

18   There, too, VisionDirect expressed concern about the antitrust law problems

19   associated with 1-800 Contacts' agreement. VisionDirect expressed its concerns in the

20   2009 Agreement, which provided:

> **RECITALS**
>
> WHEREAS, the Dispute arises out of the allegations that Vision Direct's Internet advertisement appeared in the search results pages of one or more Internet search engines when a user searched for 1-800 Contacts.
>
> WHEREAS, 1-800 Contacts claims that the appearance of such Internet advertisements violates the 2004 Settlement Agreement, and infringes 1-800 Contacts' trademarks;
>
> WHEREAS, Vision Direct and Drugstore.com have raised a concern that an agreement with a competitor to implement negative keywords could implicate the antitrust laws of the United Sates, and 1-800 Contacts has taken the position that no antitrust laws would be violated by such an agreement;

27   56.    This action by VisionDirect was against its economic interests.  In a

28   competitive marketplace, VisionDirect would have continued to compete, in both

1   advertising and on price.  It could have covered its prices and increased its market

2   share, taking from 1-800 Contacts.  Instead, it agreed not to compete.  This rationale

3   applies to the remainder of the Doe Defendants.  No Doe Defendant was acting in its

4   best economic interest, unless there was a conspiracy.

5       57.    Importantly, VisionDirect and the remainder of the Doe Defendants must

6   have known that the other defendants were coming to the same agreement with 1-800

7   Contacts.  This tacit agreement, in light of the other allegations in the complaint,

8   including the continued market share of 1-800 Contacts, are enough to establish §1

9   liability through a hub-and-spoke conspiracy with 1-800 Contacts at the center.  On

10  information and belief, 1-800 Contacts assured VisionDirect and the other Doe

11  Defendants that it was entering into agreements with all the participants in the direct-

12  to-consumer contact lens market.  This would ensure that each market participant was

13  guaranteed to maintain its market share and, with no competing search results coming

14  up when each company's name was searched for, would enable VisionDirect and the

15  co-conspirators to charge supracompetitive prices.

16      58.    Another factor making this conspiracy successful was how easy it was to

17  ensure that no competitor was cheating on the conspiracy and violating the terms of

18  their agreement.  All it would take to ensure that a competitor was abiding by the

19  conspiracy was a simple internet search.

20      59.    1-800 Contacts also sought to force many of its other competitors to

21  implement measures similar to those agreed to by VisionDirect,[3] including the

22  following:

23          (a)    JSJ Enterprises: JSJ sold replacement contact lenses to consumers

24  at www.contactlensconnection.com.

25          (b)    Premier Holdings: Premier Holdings sold replacement contact

26  lenses to consumers at www.ezcontactusa.com and www.filmart.com.  After 1-800

27  _____

28  [3]   On information and believe, these likely co-conspirators are the Doe Defendants.

- 17 -

1  Contacts initiated litigation, 1-800 Contacts and Premier Holdings entered into a string
2  of eight stipulations to extend the deadline to answer in order for the parties to
3  continue settlement discussions.

4          (c)    LensWorld: LensWorld sold replacement contact lenses to
5  consumers at www.lensworld.com, www.contactmania.com and
6  www.contactlensworld.com.   After extensive settlement discussions, LensWorld
7  ultimately allowed the court to enter an order, through a default motion, which
8  required LensWorld to "'implement the negative keywords attached hereto as Exhibit
9  A in any search engine advertising campaign performed for the benefit of
10 [LensWorld], where possible, for so long as any one of [1-800 Contacts'] federally
11 registered trademarks remain active.'" The list included 36 different search terms,
12 including "www.contacts.com."

13         (d)    Lensfast: Lensfast sold replacement contact lenses to consumers at
14 www.lensfast.com, www.contactlens.com and www.e-contacts.com.   It also sold
15 contacts over the telephone at 1-800 LENSFAST.

16         (e)    Lenses for Less: Lenses for Less sold replacement contact lenses to
17 consumers at www.lensesforless.com.

18         (f)    Arlington Contact Lens Service: Arlington Contact Lens Service,
19 which did business as Discount Contact Lenses, sold replacement contact lenses to
20 consumers at www.discountcontactlenses.com and www.aclens.com.

21         (g)    Empire Vision Center: Empire Vision Center sold replacement
22 contact lenses to consumers at www.lens123.com.

23         (h)    Contact Lens King: Contact Lens King sold replacement contact
24 lenses to consumers at www.contactlensking.com.

25         (i)    Tram Data: Tram Data LLC sold replacement contact lenses to
26 consumers at www.replacemycontacts.com.

27         (j)    Walgreen Company: Walgreen Company sold replacement contact
28 lenses to consumers at www.walgreens.com.

(k)  <u>Standard Optical</u>: Standard Optical sold replacement contact lenses to consumers at www.standardoptical.net.

(l)  <u>Web Eye Care</u>: Web Eye Care, Inc. sold replacement contact lenses to consumers at www.webeyecare.com.

(m)  <u>Memorial Eye</u>: Memorial Eye P.A. sold replacement contact lenses to consumers at www.shipmycontacts.com, www.ship-my-contacts.com and www.iwantcontacts.com.

**1-800 Contacts' Lawsuit Against Lens.Com**
**Is Dismissed for Lack of Merit**

60.  1-800 Contacts also sent cease-and-desist letters and ultimately filed a lawsuit against it rival, Lens.com.  As it had with many of its other rivals, 1-800 Contacts sought an order preventing Lens.com "'from using any variation of the 1-800 CONTACTS Marks and any other marks or names that are confusingly similar,'" including "'sponsored advertising triggers, other identifiers, keywords or other terms used to attract or divert traffic on the Internet or to secure higher placement within the search engine results.'"  Also, as it had with its other rivals, 1-800 Contacts based its lawsuit on the incorrect presumption that Lens.com had purchased "1-800 Contacts" as a keyword from search engines.  However, Lens.com fought the lawsuit.

61.  On December 14, 2010, the district court dismissed 1-800 Contacts' lawsuit.  In a published 40-page decision, the court found that "[1-800 Contacts] has presented no evidence to show that [Lens.com] ever purchased [1-800 Contacts'] exact service mark as a keyword."  *1-800 Contacts, Inc.*, 755 F. Supp. at 1160.  More importantly, the court took aim at 1-800 Contacts' practice of seeking agreements, through cease-and-desist letters, that precluded a competitor's advertisements from appearing on a search-results page anytime its mark is entered as a search term.  It said that such a result would be "an anti-competitive, monopolistic protection to which it is not entitled":

> As stated above, Plaintiff [1-800 Contacts] sends cease and desist letters anytime a competitor's advertisement appears when Plaintiff's

mark is entered as a search term.  Were Plaintiff actually able to preclude competitor advertisements from appearing on a search-results page anytime its mark is entered as a search term, it would result in an anti-competitive, monopolistic protection, to which it is not entitled.

*Id*. at 1174.

62.     The district court's skepticism about such agreements continued, as it questioned whether any such contract between 1-800 Contacts and Lens.com would survive an antitrust challenge.  According to the order:

Were this actually an agreement entered into by the parties, the court questions whether it would survive an antitrust challenge. [1-800 Contacts] does not seek merely to preclude usage of its trademark. Instead, it wants to obliterate any other competitor advertisement from appearing on a search-results page when a consumer types in "1800Contacts" as a *search term* or some variation of it. This is disturbing given that broad matching of the generic term "contacts" could trigger an advertisement if a consumer enters the search term "1800Contacts." A trademark right does not grant its owner the right to stamp out every competitor advertisement.

*Id*. at 1188 (emphasis in original).

63.     On July 16, 2013, the Tenth Circuit affirmed the district court's summary judgment on all of 1-800 Contacts' claims based on keyword use that did not result in ads displaying 1-800 Contacts' mark in their text.

## ANTICOMPETITIVE EFFECTS OF THE AGREEMENTS

64.     Defendants' conduct harmed plaintiffs and the Class and California Subclass by depriving them of a marketplace in which consumers of contact lenses make their decisions about the purchase of contact lenses free from the influence of defendants' bilateral agreements, which restrain truthful advertising by competitors responsible for the vast majority of direct-to-consumer sales of contact lenses.

65.     Defendants' price-fixing conspiracy had the following anticompetitive effects, among others: (a) price competition has been restrained or eliminated with respect to contacts lenses sold directly to consumers, including online, in the United States and California; (b) the price of contact lenses sold directly to consumers, including online, in the United States and California has been fixed, raised, maintained, or stabilized at artificially inflated levels; and (c) purchasers of contact

lenses sold directly to consumers, including online, in the United States and California have been deprived of free and open competition. During the Class Period, plaintiffs and the members of the Class and the California Subclass paid supracompetitive prices for contact lenses sold directly to consumers, including online, in the United States and California.

66.    Plaintiffs have suffered significant injury as a result of defendants' contact lens price manipulation conspiracy.  Typically, when consumers conduct web searches for contact lenses, they are presented with options from a range of contact lens sellers.  Any sellers who were offering the same contact lenses at prices higher than their competitors would either (i) retain higher prices and risk losing business to rivals or (ii) lower prices to bring their prices in line with their competitors' prices and compete for the business.   Falling prices would, in turn, stimulate additional competition among various contact lens sellers.  However, through agreements that rigged search results in response to online user queries, defendants ensured that consumers were presented with only one option – the option to pay whatever defendants wanted to charge in a competition-free market – as long as it was not enough to drive them to run another search.  But for defendants' anticompetitive conduct, consumers such as plaintiffs would have been aware of and presented with options from various sellers of contact lenses, and would have purchase lenses from the seller featuring the lowest price.

67.    By reason of the alleged violations of federal and California laws, plaintiffs and the members of the Class and California Subclass have sustained injury to their business or property in the form of the overcharges they paid for contact lenses sold directly to consumers, including online, in the United States and California.  Plaintiffs and the Class paid more for contact lenses than they would have in the absence of defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

1      68.    In formulating and effectuating the contract, combination or conspiracy,

2  defendants and their co-conspirators engaged in anticompetitive activities, the purpose

3  and effect of which was to fix, maintain, suppress, inflate and otherwise make

4  artificial the price of contact lenses sold directly to consumers, including online, in the

5  United States and to California residents.

6      69.    Plaintiffs suffered antitrust injury in that they paid more for contact

7  lenses purchased from defendants than they would have paid had the manipulation not

8  occurred.

9      70.    Injury to plaintiffs and the Class and the California Subclass also resulted

10  from defendants' deprivation of the benefits of free and open competition in the

11  market for online contact lens sales.

12                                   **CLASS ALLEGATIONS**

13      71.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(2)

14  and (b)(3) of the Federal Rules of Civil Procedure on behalf of all Class members,

15  defined as: All persons that made at least one retail purchase of contact lenses from

16  defendants from January 1, 2004 through the present ("Class Period").  Excluded from

17  the Class are defendants, their parent companies, subsidiaries and affiliates, any co-

18  conspirators, governmental entities and instrumentalities of government, states and

19  their subdivisions, agencies and instrumentalities.

20      72.    Plaintiffs also bring this action on behalf of the California Subclass,

21  which is defined as: all members of the Class that reside in California that made at

22  least one retail purchase of contact lenses from defendants from January 1, 2004

23  through the present.

24      73.    The Class and California Subclass are ascertainable and are ones for

25  which records should readily exist.

26      74.    Members of each class are so numerous that joinder is impracticable.

27  Plaintiffs do not know the exact size of the Class and Subclass, but because of the

28  nature of the trade and commerce involved, plaintiffs believe that there are tens, if not

1  hundreds, of thousands of Class members as described above, the exact number and

2  identities being known to defendants and their co-conspirators. Moreover, the

3  members of the Class are dispersed across the United States.

4       75.    There is a well-defined community of interest among plaintiffs and the

5  members of the Class and California Subclass. Because defendants have acted in a

6  manner generally applicable to the Class and California Subclass, questions of law

7  and fact common to members of the Class and California Subclass predominate over

8  questions, if any, that may affect only individual members of the Class and California

9  Subclass. Such generally applicable conduct is inherent in defendants' wrongful and

10  anticompetitive conduct.

11       76.    Among the questions of law and fact common to the Class are:

12       (a)    whether defendants and their co-conspirators entered into an

13  agreement, combination or conspiracy to rig the bidding in search engine advertising

14  auctions, increase or maintain supracompetitive prices for contact lenses, allocate the

15  market for online contact lens sales, and/or prevent the dissemination of information

16  concerning competitors' pricing of contact lenses;

17       (b)    the identity of the participants of the alleged conspiracy;

18       (c)    the duration of the conspiracy alleged herein and the acts

19  performed by defendants and their co-conspirators in furtherance of the conspiracy;

20       (d)    whether, pursuant to bidding agreements, defendants agreed to

21  restrict bidding in search advertising auctions;

22       (e)    whether the bidding agreements were necessary to yield a

23  procompetitive benefit that is cognizable and non-pretextual;

24       (f)    whether such agreements are *per se* unlawful because they restrict

25  competition;

26       (g)    whether such agreements are unlawful under the rule of reason;

27       (h)    whether 1-800 Contacts possessed market power or monopoly

28  power over direct-to-consumer and online sales of contact lenses;

1       (i)     whether the law requires definition of a relevant market when

2 direct proof of market power or monopoly power is available and, if so, the definition

3 of the relevant market(s);

4       (j)     whether defendants' conduct affected interstate and intrastate

5 commerce;

6       (k)     whether the conduct of defendants and their co-conspirators, as

7 alleged in this complaint, caused injury to plaintiffs and the other members of the

8 Class;

9       (l)     whether the effects of defendants' alleged conspiracy were

10 anticompetitive in nature; and

11       (m)     the appropriate nature of class-wide injunctive or other equitable

12 relief.

13     77.    Among the questions of law and fact common to the California Subclass

14 are:

15       (a)     whether the alleged conspiracy violated the Cartwright Act;

16       (b)     whether the alleged conspiracy violated the UCL;

17       (c)     whether the conduct of defendants and their co-conspirators, as

18 alleged in this complaint, caused injury to the plaintiffs and the other members of the

19 California Subclass;

20       (d)     the effect of defendants' alleged conspiracy on the prices of

21 contact lenses sold directly to consumers, including online, to California residents

22 during the Class Period;

23       (e)     the appropriate class-wide measure of damages; and

24       (f)     the appropriate nature of class-wide injunctive or other equitable

25 relief.

26     78.    There are no defenses of a unique nature that may be asserted against

27 plaintiffs individually, as distinguished from the other members of the Class, and the

28 relief sought is common to the Class.

79.     There are no defenses of a unique nature that may be asserted against plaintiffs individually, as distinguished from the other members of the California Subclass, and the relief sought is common to the California Subclass.

80.     Plaintiffs are members of the Class and their claims are typical of the claims of the other members of the Class.  Plaintiffs were damaged by the same wrongful conduct of defendants.

81.     Plaintiffs are members of the California Subclass and their claims are typical of the claims of the other members of the California Subclass.  Plaintiffs were damaged by the same wrongful conduct of defendants.

82.     Plaintiffs will fairly and adequately protect the interests of other Class and California Subclass members because they have no interests antagonistic to, or that conflict with, those of any other Class or California Subclass member.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them and the other members of the Class and California Subclass.

83.     A class action is the superior method for the fair and efficient adjudication of this controversy.  Class treatment will enable a large number of similarly situated parties to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that would result if individual actions were pursued.

84.     This case is also manageable as a class action.  Plaintiffs know of no difficulty to be encountered in the prosecution of this action that would preclude its maintenance as a class action.  In any event, the benefits of proceeding as a class action, including providing injured persons or entities with a method for obtaining redress for claims that could not practicably be pursued individually, substantially outweigh potential difficulties in the management of this action as a class action.

85.     Defendants' unlawful acts alleged in this complaint had a substantial effect on commerce and caused antitrust injury to plaintiffs and the Class and the California Subclass.

86.     Defendants' unlawful acts had the purpose and effect of manipulating the price of contact lenses sold directly to consumers, including over the internet, in the United States and to California residents.

87.     As a direct result of defendants' violations, plaintiffs and the members of the Class and California Subclass have been damaged.

88.     As a direct and foreseeable result of defendants' unlawful anticompetitive acts, the prices of contact lenses sold directly to consumers, including online, in the United States and to California residents was manipulated and inflated.

89.     In addition, as a direct and foreseeable result of defendants' unlawful anticompetitive acts, plaintiffs, the Class and the California Subclass were deprived of the ability to receive truthful and non-misleading advertising.

## INTERSTATE AND INTRASTATE COMMERCE

90.     At all relevant times, 1-800 Contacts and its co-conspirators promoted, distributed and sold substantial amounts of contact lenses in a continuous and uninterrupted flow of commerce across state and national lines throughout the United States.

91.     Defendants transmitted and received funds, as well as contracts, invoices and other forms of business communications and transactions, in a continuous and uninterrupted flow of commerce across state and national lines throughout the United States.

92.     In furtherance of their efforts to monopolize and restrain competition, defendants employed the United States mails and interstate telephone lines, as well as interstate travel.  Defendants' activities were within the flow of, and have substantially affected (and will continue to substantially affect), interstate commerce.

93.     Defendants' anticompetitive conduct also had substantial intrastate effects in that price competition in California has been restrained or eliminated with respect to contact lenses sold directly to consumers and online, the price of contact lenses sold directly to consumers and online in California has been fixed, raised, maintained or stabilized at artificially inflated levels, and purchasers of contact lenses sold directly to consumers and online in California have been deprived of free and open competition.  The agreements to restrict bidding in search advertising auctions for the online sale of contact lenses directly impacted and disrupted commerce within California.

94.     During the Class Period, contact lenses sold by defendants were shipped into California and were sold to or paid for by plaintiffs and Class members in California.

## PLAINTIFFS' CLAIMS ARE TIMELY

95.     Plaintiffs bring their claims within the applicable statute of limitations.

96.     Defendants concealed their anti-competitive activities by, among other things, engaging in secret communications in furtherance of the conspiracy. Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of their agreements alleged herein.

97.     None of the facts or information available to plaintiffs, if investigated with reasonable diligence, could or would have led to the discovery of the conduct alleged in this complaint.  Plaintiffs and the Class were led to believe that the prices offered to them were the product of legitimate market conditions rather than defendants' manipulative collusive activities.

98.     As a result, plaintiffs were prevented from learning of the facts needed to commence suit against defendants until no earlier than August 8, 2016, when the FTC filed a complaint against 1-800 Contacts.  There are many other reasons why these facts could not have been known, including that: (i) defendants' advertising strategies are not public information; (ii) search engines do not publish information concerning

1    particular search terms and search algorithms; and (iii) the horizontal agreements
2    restricting trade were not disclosed publicly.

3    99.    Because of defendants' active steps, including the fraudulent
4    concealment of their conspiracy to prevent plaintiffs from discovering and suing them
5    for the anti-competitive activities alleged in this complaint, defendants are equitably
6    estopped from asserting that any otherwise applicable limitations period has run, or
7    that the statute of limitations began running before August 8, 2016.

8                                    **MONOPOLY POWER**

9    100.    At all relevant times, 1-800 Contacts had market power because it had the
10   power to maintain the price of contact lenses sold directly to consumers and online
11   without losing so many sales as to make the supracompetitive price unprofitable.
12   Indeed, to this day, 1-800 Contacts' prices for contact lenses are consistently up to
13   40% higher than the prices charged by others in the direct-to-consumer and online
14   markets.

15   101.    At all relevant times, 1-800 Contacts operated in the relevant markets.  1-
16   800 Contacts sold contact lenses directly to consumers and online at prices well in
17   excess of its marginal costs and the competitive price for contact lenses, and enjoyed
18   the resulting high profit margins and correspondence financial benefits – to the
19   financial detriment of plaintiffs and Class members.

20   102.    1-800 Contacts, at all relevant times, had enjoyed high barriers to entry
21   with respect to competition in the relevant product market due to regulatory
22   protections.  The FTC has studied the various barriers to entry in the contact lens
23   market.  Such barriers to entry include:

24          (a)    New entrants must acquire and possess a substantial amount of
25   inventory of contact lenses from various manufacturers to attract consumers and meet
26   their needs with prompt delivery.

27          (b)    Before entering the market, new entrants must invest an enormous
28   amount of money and other resources into their businesses.  For example, new

entrants must recruit, hire and train personnel and lease or buy real estate. New entrants must invest in the significant information and systems infrastructure necessary to support online commerce. New entrants must also create and then invest in the significant promotional activities necessary to attract customers to their online sales website.

(c)     New entrants must overcome established, dominant sellers such as 1-800 Contacts, VisionDirect and the Doe Defendants, and established buyer preferences. As alleged herein, 1-800 Contacts has dominated the market for direct-to-consumer and online sales of contact lenses for many years.

(d)     1-800 Contacts' practices also serve to deter potential new competitors from entering the direct-to-consumer and online markets for the sale of contact lenses.

(e)     New entrants must establish and maintain relationships with contact lens manufacturers and consumers. New entrants must negotiate and acquire distribution rights from contact lens manufacturers to sell their products online. Establishing and maintaining relationships with manufacturers is costly and time-consuming. New entrants must also attract enough customers to cover their substantial operating expenses.

**1-800 CONTACTS' UNILATERAL ARBITRATION PROVISION IS NOT BINDING AND UNENFORCEABLE**

103.   1-800 Contacts' website has a "Terms of Service" page. The terms of service page claims that "Any dispute relating in any way to your visit to this website or to products you purchase through us shall be submitted to confidential arbitration in Salt Lake City, Utah, except that, to the extent you have in any manner violated or threatened to violate our intellectual property rights, we may seek injunctive or other appropriate relief in any state or federal court in the state of Utah, and you consent to exclusive jurisdiction and venue in such courts."

1   104.   This paragraph about arbitration, however, is not binding on plaintiffs,

2   the Class or the California Subclass.  Any agreement to arbitrate is not specifically

3   highlighted.  In fact, there are no direct links to the "Terms of Service" page on 1-800

4   Contacts homepage.  The only way to find the Terms of Service page is to click on the

5   "Common Questions (FAQ)" link on the 1-800 Contacts' homepage, which itself is in

6   extremely small print and is likely to be overlooked, as shown in Exhibit A.

7   105.   After clicking on the Common Questions link, there is still no immediate

8   mention of arbitration.  Instead, the last link on the Common Questions page, which

9   has to be scrolled down to see in most browsers, is a link entitled "Terms of Service,"

10   as shown in Exhibit A.

11   106.   After clicking on the Terms of Service link, a consumer can finally

12   access the Terms of Service page, which contains the mention of arbitration.  Even in

13   the unlikely event that a consumer did find and review the Terms of Service page

14   before ordering contact lenses through 1-800 Contacts' website, the arbitration

15   language is only viewable if a user scrolls down to a section titled "Disputes," as

16   shown in Exhibit A.

17   107.   In addition, there is no place for a consumer to acknowledge receipt of

18   the arbitration provision or for a consumer to acknowledge that it understood that it

19   was governed by the arbitration provision.  In fact, there is no requirement that a

20   1-800 Contacts customer even see the arbitration provision before ordering contacts

21   through 1-800 Contacts' website, let alone take action to expressly consent to the

22   arbitration provision.  Accordingly, there was never any meeting of the minds, as

23   required by law, regarding the arbitration of disputes and any reasonable user of 1-800

24   Contacts' website would be surprised by the existence of the arbitration provision.

25   108.   1-800 Contacts retained the full right to unilaterally modify the terms of

26   the arbitration agreement, as shown by its carve out of intellectual property disputes.

27   109.   Accordingly, 1-800 Contacts' arbitration provision is unconscionable,

28   contrary to public policy and unenforceable.

**COUNT I**

**For Violations of §§1 and 3 of the Sherman Antitrust Act**
**Against All Defendants**
**(On Behalf of the Class)**

110.   Plaintiffs incorporate by reference the preceding allegations.

111.   Defendants, and their co-conspirators, entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of §§1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§1 and 3.   The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among defendants and their co-conspirators in furtherance of which defendants artificially fixed, raised, maintained and/or stabilized the prices for contact lenses sold directly-to-consumers, including online, throughout the United States.

112.   Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among 1-800 Contacts, VisionDirect and the other Doe Defendants.   Defendants' conspiracy is a *per se* violation of the Sherman Antitrust Act and is, in any event, an unreasonable and unlawful restraint of trade.

113.   There is no legitimate business justification for, or procompetitive benefit caused by, defendants' unreasonable restraint of trade.   Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

114.   Defendants' conspiracy, and the resulting impact on the prices of contact lenses, and the information provided to consumers, occurred in and affected interstate commerce and commerce in and between the territories of the United States.

115.   As a direct, intended, foreseeable, and proximate result of defendants' conspiracy and overt acts taken in furtherance therefore, plaintiffs and each member of the Class have suffered injury.   Plaintiffs' and each Class member's damages are directly attributable to defendants' conduct, which resulted in all Class members paying more for contact lenses than they would have otherwise paid, but for defendants' agreements.

1    116.   Plaintiffs' and the Class's injuries are the type the antitrust laws were

2  designed to prevent and flow from that which makes defendants' conduct unlawful.

3  Plaintiffs and the Class are entitled to treble damages, attorneys' fees, reasonable

4  expenses, and cost of suit for the violations of the Sherman Antitrust Act.

5                                          **COUNT II**

6                    **For Violation of §2 of the Sherman Antitrust Act**
                                    **Against 1-800 Contacts**
7                                 **(On Behalf of the Class)**

8    117.   Plaintiffs incorporate by reference the preceding allegations.

9    118.   At all relevant times, 1-800 Contacts possessed substantial monopoly and

10  market power with respect to direct-to-consumer and online sales of contact lenses.  1-

11  800 Contacts possessed the power to control prices, and prevent prices from falling, in

12  direct-to-consumer sales of contact lenses, including in online sales.

13    119.   In violation of §2 of the Sherman Antitrust Act, 1-800 Contacts

14  monopolized, attempted to monopolize and conspired or agreed to monopolize the

15  direct-to-consumer and online markets for contact lenses.  As previously alleged,

16  beginning in 2004 and continuing thereafter, 1-800 Contacts abused its monopoly

17  power to inflate the price of contact lenses sold directly to consumers, among other

18  ways, by (i) sending a series of cease-and-desist letters that included baseless

19  representations regarding competitors' supposed purchases and uses of 1-800

20  Contacts' service mark as a keyword for online searches, (ii) seeking agreements that

21  far exceed the scope of 1-800 Contacts' trademark rights, (iii) filing objectively and

22  subjectively baseless litigation against competitors for the purpose of interfering with

23  their ability to compete in the online market for contact lenses, and (iv) entering into

24  anticompetitive agreements with its competitors that prevented direct-to-consumer and

25  online sellers of contact lenses from competing against each other, and with 1-800

26  Contacts.

27    120.   1-800 Contacts did not obtain or maintain its monopoly power by reason

28  of a superior product, business acumen or historic accident.

121.   1-800 Contacts' scheme harmed competition as detailed above.

122.   As a direct and proximate result of 1-800 Contacts' illegal and monopolistic conduct, as alleged herein, plaintiffs and the Class were injured.

### COUNT III

**For Violations of the Cartwright Act**
**Against All Defendants**
**(On Behalf of the California Subclass)**

123.   Plaintiffs incorporate by reference the preceding allegations.

124.   The acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code §16700, *et seq*.

125.   It is appropriate to bring this action under the Cartwright Act because many of the purchasers reside in California and because other overt acts in furtherance of the conspiracy and overcharges flowing from those acts occurred in California.

126.   As detailed above, the anticompetitive conduct described herein constitutes a *per se* violation of California's antitrust laws and is an unreasonable and unlawful restraint of trade.  The anticompetitive effects of defendants' conduct far outweigh any purported non-pretextual, pro-competitive justification.

127.   As a proximate result of defendants' unlawful conduct, plaintiffs and the members of the California Subclass they seek to represent have been injured in their business or property in violation of the Cartwright Act, Cal. Bus. & Prof. Code §16700, *et seq*., by paying supracompetitive prices for contact lenses bought over the internet during the Class Period. Such overcharges are the type of injury the antitrust laws were designed to prevent and flow directly from defendants' unlawful conduct. Plaintiffs and members of the California Subclass are proper entities to bring a case concerning this conduct.

128.   Plaintiffs and members of the California Subclass have standing to and hereby seek monetary relief, including treble damages, together with other relief, as well as attorneys' fees and costs, as redress for defendants' Cartwright Act violations.

**COUNT IV**

**For Violations of California's Unfair Competition Law**
**Against All Defendants**
**(On Behalf of the California Subclass)**

129.   Plaintiffs incorporate by reference the preceding allegations.

130.   Plaintiffs bring this claim under §§17203 and 17204 of the Cal. Bus. & Prof. Code to enjoin, and obtain restitution and disgorgement of all monetary gains that resulted from, acts that violated §17200, *et seq.*, of the Cal. Bus. & Prof. Code, commonly known as the UCL.

131.   Plaintiffs and the members of the California Subclass have standing to bring this action under the UCL because they have been harmed and have suffered injury by being forced to pay inflated, supracompetitive prices for contact lenses sold directly to California residents during the Class Period.

132.   In formulating and carrying out the alleged agreement, understanding and conspiracy, defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to, the acts, practices and course of conduct set forth herein, and these acts constitute unfair competition in violation of the UCL.

133.   Defendants' conspiracy had the following effects, among others: (i) price competition in the market for contact lenses sold directly to California residents, including online, during the Class Period was restrained, suppressed and/or eliminated; (ii) prices for contact lenses sold to California residents during the Class Period by defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels; and (iii) plaintiffs and members of the California Subclass who purchased contact lenses in California during the Class Period directly from defendants have been deprived of the benefits of free and open competition.

134.   As a direct and proximate result of defendants' anticompetitive conduct, plaintiffs and members of the California Subclass have been injured in their business

1    or property by paying more for contact lenses sold directly to California residents and

2    purchased directly from defendants during the Class Period than they would have paid

3    absent of the conspiracy.

4        135.   The anticompetitive behavior, as described above, is unfair,

5    unconscionable, unlawful and fraudulent, and in any event it is a violation of the

6    policy or spirit of the UCL.

7                        **PRAYER FOR RELIEF**

8        WHEREFORE, plaintiffs pray that the Court:

9        A.    Determine that this action may be maintained as a class action pursuant

10   to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and direct that reasonable notice of this

11   action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class and California

12   Subclass, and declare plaintiffs representative of the Class and California Subclass;

13       B.    Enter a judgment awarding plaintiffs and the Class and California

14   Subclass damages against defendants as a result of defendants' unlawful conduct

15   alleged in this complaint, plus treble damages and all other available damages,

16   including any statutory or liquidated damages or otherwise;

17       C.    Award to plaintiffs and the Class and California Subclass their costs of

18   suit, including reasonable attorneys' and experts' fees and expenses;

19       D.    Order that defendants, their directors, officers, employees, agents,

20   successors, members, and all persons in active concert and participation with them be

21   enjoined and restrained from, in any manner, directly or indirectly, committing any

22   additional violations of the law as alleged herein; and

23       E.    Award any other and further relief as the Court may deem just and

24   proper.

25

26

27

28

1

**DEMAND FOR JURY TRIAL**

2

      Plaintiffs respectfully demand a trial by jury on all issues that can be tried to a

3

jury.

4

DATED: October 13, 2016             ROBBINS GELLER RUDMAN
                                                            & DOWD LLP

5

                                          PATRICK J. COUGHLIN
                                          DAVID W. MITCHELL

6

                                          BRIAN O. O'MARA
                                          STEVEN M. JODLOWSKI

7

                                          CARMEN A. MEDICI

8

9

                                          *s/Steven M. Jodlowski*

                                      STEVEN M. JODLOWSKI

10

11

                                        655 West Broadway, Suite 1900
                                        San Diego, CA 92101

12

                                        Telephone: 619/231-1058
                                        619/231-7423 (fax)

13

                                        ROBBINS ARROYO LLP
                                        BRIAN J. ROBBINS

14

                                        GEORGE C. AGUILAR
                                        GREGORY DEL GAIZO

15

                                        600 B Street, Suite 1900
                                        San Diego, CA 92101

16

                                        Telephone: 619/525-3990
                                        619/525-3991 (fax)

17

                                        BROWNSTEIN LAW GROUP, PC

18

                                        JOSHUA S. BROWNSTEIN
                                        M. RYDER THOMAS

19

                                        353 Sacramento Street, Suite 1140
                                        San Francisco, CA 94111

20

                                        Telephone: 415/986-1338
                                        415/986-1231 (fax)

21

                                        Attorneys for Plaintiffs

22

I:\Admin\CptDraft\Antitrust\Cpt 800 Contacts.docx

23

24

25

26

27

28