ANDERSON & KARRENBERG
THOMAS R. KARRENBERG (#3726)
JARED SCOTT (#15066)
50 West Broadway, Suite 700
Salt Lake City, UT 84101
Telephone: 801/534-1700
801/364-7697 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID W. MITCHELL
BRIAN O. O'MARA
STEVEN M. JODLOWSKI
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

BOIES SCHILLER FLEXNER LLP
SCOTT E. GANT
MELISSA FELDER ZAPPALA
1401 New York Ave., NW
Washington, DC 20005
Telephone: 202/237-2727
202/237-6131 (fax)
        and
CARL GOLDFARB
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: 954/356-0011
954/356-0022 (fax)

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| J. THOMPSON, IYSHA ABED, DANIEL J. BARTOLUCCI, ALEXA BEAN, WILLIAM P. DUNCANSON, TYLER NANCE, LEIA PINTO, JILL SCHULSON, and EDWARD UNGVARSKY, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) | No. 2:16-cv-01183 <br><br> PROPOSED CLASS ACTION <br><br> Judge Tena Campbell <br><br> Magistrate Judge Dustin B. Pead |
| Plaintiffs, | ) ) | CONSOLIDATED AMENDED COMPLAINT |
| vs. | ) ) ) | |
| 1-800 CONTACTS, INC., VISION DIRECT, INC., WALGREENS BOOTS ALLIANCE, INC., WALGREEN CO., ARLINGTON CONTACT LENS SERVICE, INC., NATIONAL VISION, INC., LUXOTTICA RETAIL NORTH AMERICA, INC., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

1268478_2

Plaintiffs J. Thompson, Iysha Abed, Daniel J. Bartolucci, Alexa Bean, William P. Duncanson, Tyler Nance, Leia Pinto, Jill Schulson, and Edward Ungvarsky ("Plaintiffs") hereby bring this action for damages and other relief against Defendants 1-800 Contacts, Inc. ("1-800 Contacts"), Vision Direct, Inc. ("Vision Direct"), Walgreens Boots Alliance, Inc. and Walgreen Co. (collectively, "Walgreens"), Arlington Contact Lens Service, Inc. ("AC Lens"), Luxottica Retail North America Inc. ("Luxottica") and National Vision, Inc. ("National Vision") (collectively "Defendants") for violations of §1 of the Sherman Antitrust Act.

## DEFENDANTS' ANTICOMPETITIVE CONDUCT

1.      Plaintiffs are proposed Class representatives of a nationwide class of consumers who purchased contact lenses online from Defendants, and are bringing an action against Defendants for suppressing competition in the online market for contact lenses.  Plaintiffs seek relief from Defendants for violations of federal antitrust law.

2.      1-800 Contacts is the instigator and primary enforcer of a series of unlawful written agreements between it and at least 13 other online sellers of contact lenses (the "Agreeing Contact Lens Sellers").  The Agreeing Contact Lens Sellers collectively control approximately 80% of the online retail market for contact lens sales.  1-800 Contacts alone accounts for over 50% of the online market.  Through these agreements, Defendants committed not to compete against one another in certain, critical online advertising, thereby suppressing competition and inflating the amount consumers paid for the online purchase of contact lenses from Defendants.

3.      Internet search engines have become indispensable to anyone using the internet. Search engines are generally simple to use – a user need only enter keywords, such as "contact lenses," into a field and the search engine will use an algorithm to find and list webpages which the search engine considers relevant to the query.

4.      Search engines, such as Google (owned by Alphabet) or Bing (owned by Microsoft), are free to users.  Their main source of revenue is advertising they sell, which appears in response to a user's search terms and is displayed along with the respective search engine's "organic" (*i.e.*, non-advertising) results.

5.      This form of advertising is enormously popular and effective because it allows advertisers to market directly to consumers at the very moment they are looking to make a purchase or have expressed an interest in a specific subject.  Online search engine advertising is important to the success of many companies – including companies that sell contacts lenses online.

6.      "Keywords" are the search terms that a search engine uses in determining whether an internet user will see a particular advertisement in response to a specific search.  Google provides the following example to prospective advertisers:

**Example**

If you sell frisbees, you can add "buy frisbee" as a keyword in your AdWords campaign. When people type "buy frisbee" on Google search, your ad might appear on the search results page. In addition, your ad could also appear on websites about ultimate frisbee.

7.      Prospective advertisers can also employ "negative keywords," in order to block their advertisements from showing in response to certain search terms.  Google provides the following example to prospective advertisers:

**Example**

If you sell dog clothes but your business doesn't carry any cat clothes, you can add "cat" as a negative keyword to make sure your ad doesn't appear to people looking for cat clothes., and you can still target searches for "pet clothes."

8.      Search engines decide which advertisements will appear in response to certain keywords through virtually instantaneous, automated auctions.  For example, Google's automated ad auction "decide[s] which ads will appear for [a] specific search and in which order those ads will

- 2 -

show on the page." Advertisers submit advertisements tied to certain keywords, and place bids for how much they will pay for their advertisements. When a person enters a search into Google, the automated auction system "finds all ads whose keywords match that search." Then the system excludes certain ads, including those that have been blocked by an advertiser's "negative keywords." The auction system evaluates each remaining ad based on the amount that its advertiser has bid, its "ad quality," and other technical factors. Finally the system allocates advertising position on the results page to the auction winners.

9.      An effective and common way for a company to raise awareness of its products and compete for sales is to purchase search advertising that will be displayed when consumers are considering purchasing a competitor's product. For example, if a consumer is looking to buy a television for the cheapest price and knows a big retailer like Best Buy sells televisions, the consumer might search for "cheaper than best buy for tvs." Such a search will likely yield sponsored ads by Best Buy, but also ads by competitors, such as Walmart.

10.     In the case of the online sale of contact lenses, however, the Agreeing Contact Lens Sellers have entered into illegal, written agreements to suppress certain online advertising. Those agreements prevent the signatories from bidding on any search keywords or phrases with the other company's names, websites or trademarks in them.

11.     The agreements also require the Agreeing Contact Lens Sellers to use "negative keywords." This is an instruction to the search provider that a company's advertisement ***should not*** appear in response to a search query that contains a particular term or terms. Normally negative keywords are used to prevent advertising appearing in response to irrelevant queries that may contain apparently similar but ultimately, irrelevant words. For example, a company that sells billiards accessories would bid for the term "pool" in order to advertise for pool sticks, but use a negative

- 3 -

keyword of "swimming" to prevent its ads from appearing when someone is looking for water-related accessories.  Here, however, Defendants have agreed to use negative keywords to suppress truthful and relevant advertising by competitors in the market for the online sale of contact lenses.

12.     At various times between 2004 and 2013, 1-800 Contacts and the other Agreeing Contact Lens Sellers entered into a series of non-public, bilateral, written agreements under which each party to the particular agreement committed to cease using or to refrain from using certain keywords for online advertising.  These ongoing agreements were all kept secret from consumers, with their secrecy enforced by non-disclosure provisions in the agreements.

13.     Defendants' actions prevented the Class from receiving the benefits of a fair and competitive marketplace for information about various companies selling contact lenses directly to consumers online and about the pricing of their contacts.  As a result of their conduct, Defendants were able to charge higher prices than if there had been full competition among the Defendants, and as a result of Defendants' conduct, members of the Class paid higher prices for contact lenses than they otherwise would have.

## VENUE AND JURISDICTION

14.     Plaintiffs' action arises under §1 of the Sherman Antitrust Act, which is codified at 15 U.S.C. §1 (and under 15 U.S.C. §3 for residents of the District of Columbia and U.S. territories).  Plaintiffs seek damages under §4 of the Clayton Act, which is codified at 15 U.S.C. §15, as well as injunctive relief under §16 of the Clayton Act, which is codified at 15 U.S.C. §26.

15.     This Court has subject-matter jurisdiction over Plaintiffs' claims under 15 U.S.C. §15; 28 U.S.C. §1331; and 28 U.S.C. §1337(a).

16.     The Court has personal jurisdiction over each of the Defendants because, *inter alia*, each of the Defendants: (a) transacted business throughout the United States, including in this

- 4 -

District; (b) sold contact lenses throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) were engaged in an unlawful restraint of trade which injured persons residing in, located in, or doing business throughout the United States, including in this District.

17.     Defendants engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.  The activities of Defendants were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

18.     Venue is proper in this District pursuant to §12 of the Clayton Act (15 U.S.C. §22) and 28 U.S.C. §1391(b)-(d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District, and one or more of the Defendants resides in, is licensed to do business in, is doing business in, had agents in, or is found or transacts business in, this District.

## PARTIES

### I.     Plaintiffs

19.     Plaintiff J. Thompson ("Thompson") is an individual residing in California.  Since 2008, Thompson purchased contact lenses directly from 1-800 Contacts through its website during the Class Period.

20.     Plaintiff Iysha Abed ("Abed") is an individual residing in New Jersey.  Abed purchased contact lenses directly from 1-800 Contacts through its website during the Class Period.

21.     Plaintiff Daniel J. Bartolucci ("Bartolucci") is an individual residing in Washington, D.C.  Bartolucci purchased contact lenses directly from 1-800 Contacts through its website during the Class Period.

22.     Plaintiff Alexa Bean ("Bean") is an individual residing in Pennsylvania.  Since 2009, Bean purchased contact lenses directly from 1-800 Contacts through its website during the Class Period.

23.     Plaintiff William P. Duncanson ("Duncanson") is an individual residing in California. Duncanson purchased contact lenses directly from 1-800 Contacts through its website during the Class Period.

24.     Plaintiff Tyler Nance ("Nance") is an individual residing in Arkansas.  Since 2008, Nance purchased contact lenses directly from 1-800 Contacts through its website during the Class Period.

25.     Plaintiff Leia Pinto ("Pinto") is an individual residing in California.  Since 2005, Pinto purchased contact lenses directly from 1-800 Contacts through its website during the Class Period.

26.     Plaintiff Jill Schulson ("Schulson") is an individual residing in Pennsylvania.  Since 2010, Schulson purchased contact lenses directly from 1-800 Contacts through its website during the Class Period.

27.     Plaintiff Edward Ungvarsky ("Ungvarsky") is an individual residing in Washington, D.C.  Ungvarsky purchased contact lenses directly from 1-800 Contacts through its website during the Class Period.

## II.    Defendants

28.    Defendant 1-800 Contacts is a company incorporated in Delaware, with its principal place of business in Draper, Utah.  1-800 Contacts sells contact lenses through the internet to customers located across the United States, including to Utah residents.

29.    Defendant Vision Direct was founded in 2000, acquired by drugstore.com in 2003, and became part of the Walgreens group of companies in 2011.  Vision Direct sells contact lenses through the internet to customers located across the United States, including to Utah residents.

30.    Defendant Walgreens Boots Alliance, Inc. is incorporated in Delaware, with its principal place of business in Deerfield, Illinois, and is the successor of Defendant Walgreen Co., an Illinois corporation.  Walgreens sells contact lenses through the internet to customers located across the United States, including to Utah residents.

31.    Defendant AC Lens is incorporated in Ohio, with its principal place of business in Columbus, Ohio.  In 2011, AC Lens was acquired by National Vision, Inc.  AC Lens sells contact lenses through the internet to customers located across the United States, including to Utah residents.

32.    Defendant National Vision is incorporated in Georgia, with its principal place of business in Lawrenceville, Georgia.  National Vision sells contact lenses over the internet to customers located across the United States, including to Utah residents.

33.    Defendant Luxottica is incorporated in Ohio with its principal place of business in Mason, Ohio.  Luxottica sells contact lenses over the internet to customers located across the United States, including to Utah residents.

### THE MARKET FOR ONLINE RETAIL SALE OF CONTACT LENSES

34.    Plaintiffs' antitrust claim arises from Defendants' violations of §1 of the Sherman Act by entering into and abiding by unlawful written agreements to restrain trade.

- 7 -

## I.   Relevant Market

35.     Insofar as Plaintiffs are required to plead the relevant product and geographic market to establish the antitrust violated alleged here, Plaintiffs allege the relevant market at issue and have pled how Defendants' conduct has harmed competitive processes in this market.

36.     A relevant market is comprised of a relevant product market and a relevant geographic market.  This case involves one antitrust product market: the market for online sales of contact lenses.  The geographic scope of this market is nationwide, extending to all contact lenses sold online in the United States.

### A.   Relevant Product Market

37.     The market for online sales has a number of unique characteristics distinguishing it from the traditional retail market.

38.     Defendants are retailers of contact lenses manufactured by other parties, from whom Defendants purchase contact lenses for sale directly to consumers.  None of the Defendants manufactures the contact lenses it sells.

39.     Because of the ease of purchasing contacts without going to a physical store, the retail market for contact lenses sold to customers at physical locations (*e.g.*, brick-and-mortar stores and sales by eye care professionals) exists separately from, is not an adequate substitute for, and does not restrain prices in the online market for the sale of contact lenses.

40.     Online sellers of contact lenses could impose a small but significant and non-transitory increase in price without losing so many sales to brick-and-mortar stores to make the price increase not profitable.

41.     Online contact lens sellers are able to sell contact lenses anywhere in the United States that receives mail.  Online contact lens sellers provide consumers the convenience of being

able to order contacts from any location without having to find a brick-and-mortar store selling the type of contact lenses covered by their prescription.

42.     Online retailers frequently maintain a large volume of inventory across various manufacturers and brands, a fulfillment center, a customer service center, and a scale of operations to develop new customer retention tools.  This allows online retailers to fulfill and ship prescriptions rapidly, unlike many brick-and-mortar retailers.

43.     Pricing for contact lenses sold online typically falls below pricing for contacts sold by eye care professionals.

44.     Retailers within the online market look primarily at other online retailers, rather than eye care professionals, in setting their pricing and customer-service offerings.

45.     Online retailers direct and tailor their advertising efforts to customers who buy contact lenses online.  To reach these customers, online retailers rely heavily on search engine advertising.  Brick-and-mortar retailers and eye care professionals, on the other hand, typically do not advertise online and, if they do, do not spend very much doing so.

**B.     The Geographic Market**

46.     The relevant geographic market is the United States.

47.     Defendants, along with other online retailers of contact lenses, sell to customers located across the United States, including in Utah.

48.     The relevant geographic market for this antitrust action for the online sale of contact lenses cannot be larger than the United States.  In the United States, contact lenses are regulated as medical devices by the United States Food and Drug Administration, which imposes special regulatory requirements on their manufacture, distribution, and sale, which are not imposed on contact lenses that are made, distributed, or sold abroad.

- 9 -

**II.     The Market for Online Retail Contact Lens Sales in the United States Is Highly Concentrated**

49.     1-800 Contacts and the other Agreeing Contact Lens Sellers have dominated the market for online sales of contact lenses since at least 2004.  Collectively, the Agreeing Contact Lens Sellers account for over 80% of the market for online contact lens sales.  1-800 Contacts alone accounts for more than 50% of the market.

50.     Since 2000, sales of contact lenses through the internet have increased due to the ease and convenience of ordering contacts online, among other factors.  In 2003, online sales of contact lenses totaled $200 million.  By 2012, the size of the market had more than tripled, increasing to $680 million.

<b>ANTICOMPETITIVE CONDUCT BY THE DEFENDANTS</b>

51.     Defendants entered into and enforced a series of illegal, written, bilateral agreements to prevent the dissemination of truthful and relevant information during the Class Period regarding competing sellers of contact lenses online and the prices they offer for their products in order to and with the effect of elevating the prices that consumers pay for the purchase of contact lenses online.

52.     1-800 Contacts is a signatory to all the unlawful agreements and has participated in this unlawful scheme since the date it signed the first such agreement.  The other Defendants have participated in this unlawful scheme starting on the date that each entered into their respective, written, anticompetitive agreements with 1-800 Contacts.

**I.     Defendants' Anticompetitive Conduct**

53.     1-800 Contacts was founded in February 1995 as 1-800-LENSNOW, but changed its name to 1-800 Contacts in or around July 1995.  It was publicly-traded from 1998 until 2007, when it was purchased by Fenway Partners LLC, reportedly for approximately $340 million.  In 2012, WellPoint acquired 1-800 Contacts, reportedly for close to $900 million.  1-800 Contacts remains

privately owned.  In December 2015, New York City-based private equity firm AEA Investors LP announced it had entered into a definitive agreement to acquire a majority interest of 1-800 Contacts for an undisclosed price.

54.     Despite 1-800 Contacts' early entry into the market for online retail sales of contact lenses, competitors, like Vision Direct and AC Lens, soon emerged, often competing with 1-800 Contacts on the basis of price.  As competitors arrived on the scene, 1-800 Contacts began losing sales to its rivals.

55.     In order to avoid lowering its prices to compete with these rivals, 1-800 Contacts devised a plan to limit competition by manipulating the market for the placement of online advertisements through online search engines.

56.     The first anticompetitive, written agreement was entered into in June of 2004 by 1-800 Contacts and Vision Direct, and the most recent in 2013.  These substantially, similar written agreements were entered into by the following parties on the dates specified below:

**1-800 Contacts' Bidding Agreement with Competitors**

| | |
|---|---|
| Vision Direct | June 2004<br>May 2009 |
| Coastal | October 2004 |
| EZ Contacts | May 2008 |
| Lensfast | December 2009 |
| AC Lens | March 2010 |
| Lenses for Less | March 2010 |
| Contact Lens King | March 2010 |
| Empire Vision | May 2010 |
| Tram Data<br>(ReplaceMyContacts) | May 2010 |
| Walgreens | June 2010 |
| Web Eye Care | September 2010 |
| Standard Optical | February 2011 |
| Memorial Eye | November 2012 |

57.     1-800 Contacts and Luxottica entered into a written agreement in December of 2013. While ostensibly a contact lens sourcing and service agreement, upon information and belief, that agreement contains similar restrictions on the parties' use of search terms to generate internet advertising.

58.     These agreements prohibit the parties from bidding against each other in certain search advertising auctions, and obligate the parties to implement certain negative keywords – thereby precluding certain competitive, truthful, and relevant online advertising.

59.     Each Defendant benefitted from the agreements 1-800 Contacts entered into with other Agreeing Contact Lens Sellers by, among other things, allowing Defendants to charge supracompetitive prices to the detriment of consumers.

60.     Each of the agreements also covers "affiliates" of the parties – third-party, website operators who display advertisements for a particular contact lens retailer, and receive a commission when a prospective customer completes a purchase after reaching the retailer through the link on the affiliate's website.  The provisions governing affiliates had the purpose and effect of extending the anticompetitive effects of the agreements even further.

### A.     Vision Direct

61.     1-800 Contacts and Vision Direct first entered into a written agreement on June 24, 2004 (the "2004 Vision Direct Agreement").  Under the 2004 Vision Direct Agreement, 1-800 Contacts and Vision Direct agreed to refrain from "causing [its] website or Internet advertisement to appear in response to any Internet search for the other Party's brand name, trademarks or URL." The agreement also prohibited Vision Direct from "causing [the other] Party's brand name, or link to

[its] Websites to appear as a listing in the search results page of an Internet search engine, when a user specifically searches for the other Party's brand name, trademarks or URLs."

62.     Vision Direct entered into this agreement with 1-800 Contacts even though its counsel, Wilson Sonsini Goodrich & Rosati, later expressed antitrust concerns about the legality of the 2004 Vision Direct Agreement as it related to the implementation of negative keywords.  On January 24, 2008, Wilson Sonsini wrote 1-800 Contacts' General Counsel:

> Separate and apart from Vision Direct's position regarding the interpretation of the contract, set forth in Ms. Kaditz's November 5, 2007 letter—that is, that the Agreement does not contemplate the implementation of negative key words—Vision Direct continues to believe that any agreement between the parties with regard to the implementation of negative key words creates an unacceptable risk of violating Section 1 of the Sherman Act, and as such, represents a serious antitrust issue.  Any such agreement would appear to represent a restraint unrelated to the terms of the Agreement and unrelated to a valid intellectual property right, and one that depresses the price of key words to search companies such as Google, Yahoo! and Microsoft.

63.     Vision Direct and 1-800 Contacts entered into a second agreement in 2009 (the "2009 Vision Direct Agreement").  Under the 2009 Vision Direct Agreement, 1-800 Contacts and Vision Direct agreed to implement negative keyword lists in connection with their internet advertising efforts.

64.     Again, however, Vision Direct expressed concern about the antitrust law problems associated with 1-800 Contacts' agreement:

> **RECITALS**
>
> WHEREAS, the Dispute arises out of the allegations that Vision Direct's Internet advertisement appeared in the search results pages of one or more Internet search engines when a user searched for 1-800 Contacts.
>
> WHEREAS, 1-800 Contacts claims that the appearance of such Internet advertisements violates the 2004 Settlement Agreement, and infringes 1-800 Contacts' trademarks;
>
> WHEREAS, Vision Direct and Drugstore.com have raised a concern that an agreement with a competitor to implement negative keywords could implicate the antitrust laws of the United States, and 1-800 Contacts has taken the position that no antitrust laws would be violated by such an agreement;

- 13 -

65.     The 2004 and 2009 Vision Direct Agreements both applied not only to Vision Direct, but to "its parent [and] subsidiaries."

66.     The 2004 and 2009 Vision Direct Agreements both included nondisclosure provisions.  Paragraph 15 of the 2004 Vision Direct Agreement provided "NON DISCLOSURE: The Parties will mutually agree on press releases and/or public statements regarding this Agreement ('the mutually agreed PR').  Neither Party will deviate from the mutually agreed PR without the prior written consent of the other Party, which consent will not be unreasonably withheld."

**B.     Walgreens**

67.     Walgreens sells contact lenses online to consumers at www.walgreens.com.

68.     On June 29, 2010, 1-800 Contacts and Walgreens entered into an agreement to refrain from certain lawful internet advertising.  Each party agreed to "refrain from purchasing or using any of the terms the other Party has listed . . . as triggering keywords in any internet search engine advertising campaign; and implement all of the terms the other Party has listed . . . as negative keywords in all internet search engine advertising campaigns."

69.     Paragraph 14 of the 2010 Agreement between 1-800 Contacts and Walgreens provides: "NON-DISCLOSURE: The terms of this Agreement and the Agreement itself shall be held in confidence and not disclosed by any Party to any third party or any other person or entity without the prior express written consent of the other Party; provided that (i) the Agreement shall be admissible in any action to enforce the Agreement; (ii) a Party to this Agreement may disclose the terms of this Agreement to its attorneys or accountants who have a legitimate need to know the terms in order to render professional advice or services; and (iii) this Agreement may be disclosed pursuant to a protective order or other order validly issued by a court of competent jurisdiction, or otherwise required by applicable law or regulations.  The Parties agree to provide prompt written notice of any

- 14 -

request, demand, subpoena, Order, or any other thing that might require disclosure of the Agreement or any of its terms, such that the other Party shall have as much time as possible to object to or attempt to prevent such disclosure.  The Parties shall make no public statements regarding the Agreement or any of its terms.  If asked by the media about this Lawsuit, the Parties shall only state that: 'The matter has been resolved to the satisfaction of both parties.'"

C.    **AC Lens**

70.    1-800 Contacts and AC Lens entered into a written agreement on March 10, 2010.  In that agreement, 1-800 Contacts and AC Lens agreed to refrain from "engaging in or participating in internet advertising or any other action that causes any website, advertisement, including pop-up advertisements, and/or a link to any website to be displayed in response to or as a result of any internet search that includes the other Party's trademark keywords or URLs."  The agreement also prohibits 1-800 Contacts and AC Lens from "using the other Party's trademark keywords or URLs . . . to target or trigger the appearance or delivery of advertisements or other content to the user," and from "using generic, non-trademarked words as keywords in any internet advertising campaign that causes any website, advertisement, including pop-up advertisements, and/or a link to any website to be displayed in response to or as a result of any internet search that includes the other Party's trademark keywords or URLs . . . without also using negative keywords as set forth in subsection (C) [of the Agreement], unless the particular internet search provider does not permit use of negative keywords."

71.    The agreement between 1-800 Contacts and AC Lens includes a non-disclosure provision.  Paragraph 16 of the agreement provides: "The parties agree to generally keep this Agreement confidential.  The parties will mutually agree on any press releases and/or public statements regarding this Agreement ('the mutually agreed PR').  Neither Party will deviate from the

- 15 -

mutually agreed PR without the prior written consent of the other Party, which consent will not be unreasonably withheld. Neither Party is prevented from disclosing this Agreement . . . in other litigation."

### D. Luxottica

72.     In 2013, 1-800 Contacts and Luxottica entered into a Sourcing and Services Agreement that, on information and belief, contains a reciprocal search advertising restriction similar to the other bidding agreements discussed herein.

### ANTICOMPETITIVE EFFECTS OF THE AGREEMENTS

73.     Defendants' conduct deprived the Class of truthful information about competing sellers of contact lenses online.

74.     Defendants' agreements had the following anticompetitive effects, among others: (a) price competition has been restrained with respect to contacts lenses sold directly to consumers online in the United States; (b) the price of contact lenses sold directly to consumers online in the United States has been artificially inflated; and (c) consumers have been deprived of truthful and relevant information about competing online sellers of contact lenses and competing price information for contact lenses.

75.     By reason of the alleged violations of federal law, Plaintiffs and the members of the Class have sustained injury to their business or property in the form of the overcharges they paid for contact lenses sold directly to consumers online in the United States. Plaintiffs and the Class paid more for contact lenses than they would have in the absence of Defendants' anticompetitive conduct and, as a result, have suffered damages. This is an antitrust injury of the type the antitrust laws were designed to deter and redress. The alleged violations of federal law also reduced the total amount of truthful information about sellers of contact lenses online and about the prices of contact lenses sold

- 16 -

online.  This is also an antitrust injury of the type the antitrust laws were designed to deter and redress.

76.     There is no procompetitive benefit caused by, or legitimate business justification for, Defendants' unreasonable restraint of trade.  Any ostensible procompetitive benefit, including protecting Defendants' trademarks, was pretextual or could have been achieved by less restrictive means.

## CLASS ACTION ALLEGATIONS

77.     Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all Class members.

78.     Pursuant to Local Rule 23-1(c), Plaintiffs allege as follows:

(1)     The proposed Class is defined as: all persons in the United States who made at least one online purchase of contact lenses from any Defendant from January 1, 2004 through the present ("Class Period"), after that Defendant entered into one of the agreements to restrain online advertising for the sale of contact lenses.[1]  Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, governmental entities and instrumentalities of government, states and their subdivisions, agencies and instrumentalities;

(2)     Without discovery, Plaintiffs do not know the exact size of the Class, but because of the nature of the trade and commerce involved, Plaintiffs believe that there are at least tens of thousands of Class members.  Members of the Class are so numerous that joinder is impracticable.  The number and identify of Class members will be ascertained through Defendants'

---

[1]     Plaintiffs will refine the class definition after discovery confirms the precise dates when each Defendant entered into its agreements with 1-800 Contacts.

records, including, but not limited to, the prescriptions Class members are required to provide in order to purchase contact lenses online, as well as the records of Plaintiffs and other Class members;

(3)     Plaintiffs will fairly and adequately protect the interests of other Class members because they have no interests antagonistic to, or that conflict with, those of any other Class member.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them and the other members of the Class;

(4)     Common questions of law and facts include:

(a)     whether Defendants entered agreements which restrained competition;

(b)     whether such agreements are unlawful;

(c)     whether Defendants' conduct injured consumers;

(d)     whether Defendants' conduct affected interstate commerce; and

(e)     the appropriate nature of class-wide injunctive or other equitable relief.

(5)     Plaintiffs are members of the Class, and their claims are typical of the claims of the other members of the Class because they were harmed by the same wrongful conduct of Defendants;

(6)     Following certification of the Class, Plaintiffs and class counsel will provide the Class the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort, consistent with Federal Rule of Civil Procedure 23(c)(2), which may include individual notice by U.S. Mail and/or email, supplemented by notice through social media as well as print and online publications; and

(7)     Because Defendants have acted in a manner generally applicable to the Class, questions of law and fact common to members of the Class predominate over any questions that may

affect only individual members of the Class.  A class action is the superior method for the fair and efficient adjudication of this controversy.  Class treatment will enable a large number of similarly situated parties to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that would result if individual actions were pursued.  This case is also manageable as a class action.  Plaintiffs know of no difficulty to be encountered in the prosecution of this action that would preclude its maintenance as a class action.

79.     Because Defendants have acted in a manner generally applicable to the Class, final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## FRAUDULENT CONCEALMENT

80.     Defendants committed to keep their agreements concealed from Plaintiffs and other Class members.  Each agreement contained a provision preventing the parties from disclosing the agreements' terms to the public.  As a result, Plaintiffs were prevented from learning of the facts needed to commence suit against Defendants.

81.     On August 8, 2016, the Federal Trade Commission ("FTC") filed and announced its administrative action against 1-800 Contacts, challenging the legality of the previously-concealed agreements.  Even then, however, the FTC redacted the identity of the Agreeing Contact Lens Sellers other than 1-800 Contacts – and the identities only became public later during the FTC proceedings.

82.     Because none of the facts or information available to Plaintiffs until well after August 8, 2016, even if investigated with reasonable diligence, could or would have led to the discovery of the conduct alleged in this Consolidated Amended Complaint, the statute of limitations otherwise applicable to Plaintiffs' claims was tolled prior to August 8, 2016.

1268478_2

83.    The running of the statute of limitations is also tolled by 15 U.S.C. §16(i), which provides:  "Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, but not including an action under Section [15a of this title], the running of the statute of limitations in respect of every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter."  This case against Defendants arises under federal antitrust laws and is based, in part, on the matter complained of in the FTC proceedings.

## COUNT I

### For Violations of the Sherman Antitrust Act and Clayton Act
### Against All Defendants

84.    Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 83, as if fully set forth herein.

85.    Defendants, and the other Agreeing Contact Lens Sellers, entered into, and abided by, agreements which unreasonably restrained trade in violation of §§1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§1 and 3.

86.    Defendants' unlawful conduct injured Plaintiffs, who seek damages under §4 of the Clayton Act, which is codified at 15 U.S.C. §15.

87.    Each Defendant is jointly and severally liable for the harm caused by its conduct or by 1-800 Contacts from the time each Defendant entered into an anticompetitive written agreement with 1-800 Contacts to the present.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

- 20 -

A.     Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) and that interim Class counsel be appointed as Class counsel;

B.     Direct that reasonable notice of this action be given to the Class, consistent with as provided by Fed. R. Civ. P. 23(c)(2);

C.     Designate Plaintiffs as representatives of the Class;

D.     Enter a judgment awarding Plaintiffs and the Class treble damages for the injuries they suffered as a result of Defendants' unlawful conduct;

E.     Award to Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, pursuant to 15 U.S.C. §15(a);

F.     Order that Defendants, their directors, officers, parents, employees, agents, successors, members, and all persons in active concert and participation with them be enjoined and restrained from, in any manner, directly or indirectly, committing any additional violations of the law as alleged herein; and

G.     Award any other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury on all issues that can be tried to a jury.

DATED:  May 31, 2017                          Respectfully submitted,

                                              BOIES SCHILLER FLEXNER LLP
                                              CARL GOLDFARB (Admitted *Pro Hac Vice*)


                                                     s/ Carl Goldfarb
                                              _____
                                                    CARL GOLDFARB

- 21 -

1268478_2

401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: 954/356-0011
954/356-0022 (fax)

BOIES SCHILLER FLEXNER LLP
SCOTT E. GANT (Admitted *Pro Hac Vice*)
MELISSA FELDER ZAPPALA
1401 New York Avenue, NW
Washington, DC 20005
Telephone: 202/237-2727
202/237-6131 (fax)

Counsel for Plaintiffs and Interim Lead Counsel for
the Putative Class

ROBBINS GELLER RUDMAN
 & DOWD LLP
DAVID W. MITCHELL
BRIAN O. O'MARA
STEVEN M. JODLOWSKI (Admitted *Pro Hac Vice*)


                    s/ Steven M. Jodlowski
                 STEVEN M. JODLOWSKI

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Counsel for Plaintiffs and Interim Lead Counsel for
the Putative Class

ANDERSON & KARRENBERG
THOMAS R. KARRENBERG (#3726)
JARED SCOTT (#15066)
50 West Broadway, Suite 700
Salt Lake City, UT 84101
Telephone: 801/534-1700
801/364-7697 (fax)

BAILEY GLASSER LLP
STEVEN L. BLOCH*
JAMES L. KAUFFMAN*
MARK B. DESANTO*
One Tower Bridge
100 Front Street, Suite 1235
West Conshohocken, PA  19428
Telephone:  610/834-7506
610/834-7509 (fax)

BROWNSTEIN LAW GROUP, PC
JOSHUA S. BROWNSTEIN
M. RYDER THOMAS
353 Sacramento Street, Suite 1140
San Francisco, CA 94111
Telephone:  415/986-1338
415/986-1231 (fax)

CARNEY BATES & PULLIAM, PLLC
RANDALL K. PULLIAM*
519 W. 7th Street
Little Rock, AR  72201
Telephone:  501/312-8500

CUNEO GILBERT & LADUCA, LLP
JONATHAN W. CUNEO (D.C. Bar No. 939389)
CHARLES J. LADUCA (D.C. Bar. No. 476134)
MATTHEW E. MILLER (D.C. Bar. No. 442857))
4725 Wisconsin Ave. NW, Suite 200
Washington, DC  20016
Telephone:  202/789-3960
202/789-1813 (fax)

DILWORTH PAXSON LLP
JOSHUA D. WOLSON*
JERRY R. DeSIDERATO*
1500 Market Street, Suite 3500E
Philadelphia, PA  19102
Telephone:  215/375-7000

GOLOMB & HONIK, P.C.
RICHARD M. GOLOMB*
KENNETH J. GUNFELD*
DAVID J. STANOCH*
1515 Market Street, Suite 1100
Philadelphia, PA  19102
Telephone:  215/985-9177
212/985-4169 (fax)

- 23 -

LOCKRIDGE GRINDAL NAUEN PLLP
ROBERT K. SHELQUIST
REBECCA A. PETERSON
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
Telephone:  612/339-6900

LAW OFFICES OF RONALD A.
  MARRON, APLC
RONALD A. MARRON
MICHAEL HOUCHIN
651 Arroyo Drive
San Diego, CA  92103
Telephone:  619/696-9006

LAW OFFICES OF WILLIAM
  MARKHAM, P.C.
WILLIAM MARKHAM
DORN BISHOP
JASON ELIASER
550 West C Street, Suite 2000
San Diego, CA  92101
Telephone:  619/221-4400

PRICE PARKINSON & KERR, PLLC
JASON KERR
5742 W. Harold Gatty Drive, Suite 101
Salt Lake City, UT  84116
Telephone:  801/517-7088

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
GEORGE C. AGUILAR
GREGORY DEL GAIZO
600 B Street, Suite 1900
San Diego, CA  92101
Telephone:  619/525-3990
619/525-3991 (fax)

Counsel for Plaintiffs

*Pro Hac Vice* application forthcoming.

1268478_2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 31, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 31, 2017.

       s/ Steven M. Jodlowski
STEVEN M. JODLOWSKI

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  sjodlowski@rgrdlaw.com

1268478_2

# Mailing Information for a Case 2:16-cv-01183-TC-DBP Thompson et al v. 1-800 Contacts, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jeffrey C. Bank**
  jbank@wsgr.com,ageritano@wsgr.com,lalmeida@wsgr.com

- **Steven H. Bergman**
  steven-bergman@rbmn.com,ladonna-whelchel@rbmn.com,info@bergmanesq.com

- **Dorn Bishop**
  db@markhamlawfirm.com,kim@dornbishoplaw.com

- **Robert S. Clark**
  rclark@parrbrown.com,calendar@parrbrown.com,achandler@parrbrown.com

- **Robert M. Corp**
  rcorp@wsgr.com,ageritano@wsgr.com

- **Tyler Anne Dever**
  tyler-dever@rbmn.com,francine-caserta@rbmn.com

- **Jason Eliaser**
  je@markhamlawfirm.com

- **Scott E. Gant**
  sgant@bsfllp.com

- **Carl E. Goldfarb**
  cgoldfarb@bsfllp.com,krenae@bsfllp.com,mcalvin@bsfllp.com,hgreen@bsfllp.com

- **Mike Houchin**
  mike@consumersadvocates.com

- **Steven M. Jodlowski**
  sjodlowski@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com

- **Ashley D. Kaplan**
  ashley.kaplan@mto.com

- **Thomas R Karrenberg**
  tkarrenberg@aklawfirm.com,aolson@aklawfirm.com

- **Jason M. Kerr**
  jasonkerr@ppktrial.com,johnsnow@ppktrial.com,elizabeth.phelps-robbins@ppktrial.com,steven.garff@ppktrial.com,angelajohnson@ppktrial.com

- **William A. Markham**
  wm@markhamlawfirm.com,la@markhamlawfirm.com,aa@markhamlawfirm.com

- **Ronald Marron**
  ron.marron@gmail.com,ecf@consumersadvocates.com

- **Sara M. Nielson**
  snielson@parrbrown.com,acoats@parrbrown.com,calendar@parrbrown.com

- **Chul Pak**
  cpak@wsgr.com,ageritano@wsgr.com

- **Rebecca A. Peterson**
  rapeterson@locklaw.com,bgilles@locklaw.com

- **Justin P. Raphael**
  justin.raphael@mto.com,mark.roberts@mto.com

- **Jared D. Scott**
  jscott@aklawfirm.com,krubino@aklawfirm.com

- **Robert K. Shelquist**
  rkshelquist@locklaw.com,kjleroy@locklaw.com,bgilles@locklaw.com

- **Rohit Kumar Singla**
  rohit.singla@mto.com,dolores.reyes@mto.com

- **Heather M. Sneddon**
  hsneddon@aklawfirm.com,krubino@aklawfirm.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`

**Comma delimited list of email addresses that may be used for copying and pasting into your own email program:**

jbank@wsgr.com,ageritano@wsgr.com,lalmeida@wsgr.com,steven-bergman@rbmn.com,
ladonna-whelchel@rbmn.com,info@bergmanesq.com,db@markhamlawfirm.com,kim@dornbishoplaw.com,
rclark@parrbrown.com,calendar@parrbrown.com,achandler@parrbrown.com,rcorp@wsgr.com,
tyler-dever@rbmn.com,francine-caserta@rbmn.com,je@markhamlawfirm.com,sgant@bsfllp.com,
cgoldfarb@bsfllp.com,krenae@bsfllp.com,mcalvin@bsfllp.com,hgreen@bsfllp.com,
mike@consumersadvocates.com,sjodlowski@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com,
ashley.kaplan@mto.com,tkarrenberg@aklawfirm.com,aolson@aklawfirm.com,jasonkerr@ppktrial.com,
johnsnow@ppktrial.com,elizabeth.phelps-
robbins@ppktrial.com,steven.garff@ppktrial.com,angelajohnson@ppktrial.com,
wm@markhamlawfirm.com,la@markhamlawfirm.com,aa@markhamlawfirm.com,ron.marron@gmail.com,
ecf@consumersadvocates.com,snielson@parrbrown.com,acoats@parrbrown.com,cpak@wsgr.com,
rapeterson@locklaw.com,bgilles@locklaw.com,justin.raphael@mto.com,mark.roberts@mto.com,
jscott@aklawfirm.com,krubino@aklawfirm.com,rkshelquist@locklaw.com,kjleroy@locklaw.com,
rohit.singla@mto.com,dolores.reyes@mto.com,hsneddon@aklawfirm.com

Click here to prepare an email to all email addressees