IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| J. THOMPSON, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>1-800 CONTACTS, INC., et al.,<br>Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:16-CV-1183-TC |

Plaintiffs, who bought contact lenses online from the Defendants, allege that they paid artificially-inflated prices for those contact lenses due to Defendants' anti-competitive agreements. To recover damages, they bring this proposed class action alleging antitrust violations of § 1 of the Sherman Act.

Defendants move to dismiss the claims[1] for failure to allege antitrust standing, failure to establish a relevant product market, and failure to allege a single overarching conspiracy. Alternatively, they argue that any damages Plaintiffs can prove must be limited to contact lens purchases made within the Sherman Act's four-year statute of limitations—i.e., 2012 to 2016. Because Plaintiffs seek damages for purchases dating back to 2004, they rely on two bases for tolling that statute: fraudulent concealment and statutory tolling. Defendants respond that Plaintiffs' allegations do not establish either. For the reasons set forth below, the motions are

---

[1] Two Defendants—Arlington Lens Contact Services (AC Lens) and National Vision (NV)—have tentatively settled with the Plaintiffs and are not part of the current proceedings.

denied.

**BACKGROUND**[2]

**Antitrust Complaint**

Plaintiffs assert in their Consolidated Amended Complaint (CAC)[3] that a series of

trademark litigation settlement agreements between 1-800 and other on-line contact lens retailers

suppressed competition in the online market for contact lenses, artificially inflated the cost of

contact lenses purchased online, and deprived consumers of complete and important information

about competing retailers and their products.  This, they contend, violated § 1 of the Sherman

Act, which provides that "[e]very contract, combination in the form of trust or otherwise, or

conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is

declared to be illegal."  15 U.S.C. § 1.

**The Agreements**

In 2004, Defendant 1-800 Contacts began filing trademark infringement cases against its

competitors.  It settled those suits and entered into settlement agreements with the targets of its

trademark litigation.  Plaintiffs contend that those settlement agreements restrain competition in

---

[2]The court's recitation of facts throughout this order is based on well-pleaded factual allegations in Plaintiffs' complaint, as well as reasonable inferences drawn from those facts.  The court treats those facts as true for purpose of analyzing the motions under Federal Rule of Civil Procedure 12(b)(6).

[3]In November 2016, contact lens purchasers J. Thompson and William Duncanson filed an antitrust complaint on behalf of themselves and others similarly situated against 1-800 Contacts, Inc. (1-800) and Vision Direct, Inc.  Around the same time, other consumers filed similar but independent complaints, either here or in other federal districts.  Given the similarity of the claims, the cases were transferred and consolidated.  On May 31, 2017, the consolidated Plaintiffs filed an amended complaint—the Consolidated Amended Complaint (CAC)—against 1-800 and Vision Direct, as well as Walgreens Boots Alliance, Inc., Walgreen Co., Luxottica Retail North America, Inc., AC Lens, and National Vision.

violation of the Sherman Act.

In each bilateral settlement agreement, the parties agreed to limit or withhold use of certain trademark and related key words in their bids for advertisement space on Internet search engines like Google and Yahoo. The agreements prohibited the retailers "from bidding on any search keywords or phrases with the other company's names, websites or trademarks in them" and required them to use "negative keywords" to prevent that company's advertisement from appearing in a response to a search query that contains one or more of the specified words. (CAC ¶¶ 10–11, ECF No. 72.) This, Plaintiffs allege, illegally manipulated the number and types of ads seen by the online shopper.

Altogether the CAC alleges the existence of fifteen agreements (see Pls.' Omnibus Mem. in Opp'n to Defs.' Mot. Dismiss ("Opp'n") at 30, ECF No. 142), four of which are addressed in some detail in the CAC. 1-800 and Vision Direct entered into two agreements: one dated June 2004 and a follow-up settlement agreement dated May 2009. In March 2010, 1-800 settled its lawsuit against AC Lens and National Vision. And finally, in June 2010, 1-800 settled with Walgreens in the fourth agreement.

**FTC's Investigation and Decision**

Before the private consumers filed their private antitrust actions, the Federal Trade Commission (FTC), in 2015, began investigating 1-800's practice of suing competitors for trademark violations and then settling with those parties on terms that limited the parties' use of trademarks in on-line advertising. In January 2015, the FTC issued a Civil Investigative Demand

to 1-800,[4] in which it sought information to determine whether 1-800 was violating antitrust law. In August 2016, following its investigation, the FTC filed an administrative complaint against 1-800. In October 2017, after a lengthy evidentiary hearing conducted by an administrative law judge, the FTC issued Findings of Fact and Conclusions of Law and ruled that 1-800 had violated Section 5 of the FTC Act, "which encompasses violations of Section 1 of the Sherman Act." (See Oct. 27, 2017 FTC Initial Decision In the Matter of 1-800 Contacts, Inc. at 117, attached as Ex. A to Notice of Supplemental Authority, ECF No. 152-1.)

The Plaintiffs, in their opposition to the motions to dismiss, point to the FTC's findings to bolster their complaint and convince the court to deny the motions to dismiss. But because the FTC decision is not part of the CAC and has no precedential value, the court will not consider it here.

**The Motions to Dismiss**

Defendants jointly filed two motions to dismiss. In the first motion, they contend that Plaintiffs lack antitrust standing, fail to allege a cognizable relevant market, and fail to allege a single overarching conspiracy or other concerted activity barred by the Sherman Act. (See Defs. Vision Direct, Inc., Walgreens Boots Alliance, Inc., Walgreen Co., & Luxottica Retail N. Am. Inc.'s Mot. Dismiss Pls.' Consol. Am. Compl., ECF No. 116 (hereinafter "Vision Direct Motion") (incorporated by 1-800 in its motion).)

In the second motion, they focus on the statute of limitations, asserting that claims based on purchases of contact lenses before October 13, 2012, are time-barred. And they challenge

---

[4]Ex. 4 to Decl. of Carl E. Goldfarb, ECF No. 143-4.

Plaintiffs' reliance on two separate rules that prevent dismissal of damages incurred before that date: (1) statutory tolling, and (2) fraudulent concealment. (See 1-800 Contacts' Mot. Dismiss Pls.' Consol. Am. Compl., ECF No. 118 (hereinafter "1-800 Motion") (incorporated by Vision Direct et al. in their motion).)[5]

## LEGAL STANDARD

When analyzing a motion to dismiss, the court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." Thomas v. Kaven, 765 F.3d 1183, 1190 (10th Cir. 2014) (internal citation and quotation marks omitted). To withstand the motions to dismiss, Plaintiffs need only show that the allegations in the CAC "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

## ANTITRUST STANDING

In order to bring a private antitrust claim, the party must have antitrust standing, which consists of "antitrust injury" and a plausible connection between that injury and the alleged violation of the antitrust laws. Tal v. Hogan, 453 F.3d 1244, 1253 (10th Cir. 2006). According to Plaintiffs, they suffered antitrust injury because the advertisement restrictions deprived them of truthful information and caused them to pay artificially inflated prices online. Defendants

---

[5]All parties filed requests for judicial notice of documents relevant to the statute of limitations issue. (See Pls.' Request for Judicial Notice, ECF No. 144; Vision Direct et al. Request for Judicial Notice, ECF No. 117; 1-800 Contacts' Request for Judicial Notice, ECF No. 120.) Judicially-noticed "documents may only be considered to show their contents, not to prove the truth of the matters asserted therein." Tal v. Hogan, 453 F.3d 1244, 1264–65 n.24 (10th Cir. 2006). The court will only consider those documents when analyzing the statute of limitations question of whether, or when, Plaintiffs were on notice of their claims against Defendants.

contend that the alleged connection between their injury and Defendants' agreements, as well as the economic theory underlying the antitrust claims, are flawed.

Courts typically consider six non-exclusive factors when analyzing whether a plaintiff has antitrust standing.  Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519 (1983) (AGC).  These AGC factors include:

> (1) the causal connection between the antitrust violation and the plaintiff's injury; (2) the defendant's intent or motivation; (3) the nature of the plaintiff's injury—i.e., whether it is one intended to be redressed by the antitrust laws; (4) the directness or the indirectness of the connection between the plaintiff's injury and the market restraint resulting from the alleged antitrust violation; (5) the speculative nature of the damages sought; and (6) the risk of duplicative recoveries or complex damages apportionment.

Sharp v. United Airlines, Inc., 967 F.2d 404, 406–07 (10th Cir. 1992) (noting that the AGC factors are not "black-letter rules" but rather guidelines for analysis).

Defendants focus on causation, the nature of the injury, and the remoteness of that injury to the alleged anti-competitive behavior.  They say that "Plaintiffs fail to allege any facts at all showing how these narrowly tailored advertising agreements caused them to pay higher prices for contact lenses than they would have but for the existence of these agreements" and that "Plaintiffs' harm (overcharges on contact lenses purchased online) is too far removed from the alleged anticompetitive conduct (restrictions on bidding for certain online advertising keywords relating to contact lenses)."  (Vision Direct Mot. at 12, 15.)

**Causation and Nature of the Injury**

In response, Plaintiffs say that their injury—a financial loss stemming from a

"competition-reducing aspect or effect"[6] of the settlement agreements—is carefully alleged in the CAC. (See Opp'n at 5–6.) This financial injury, they assert, is the "epitome of 'antitrust injury'" and is "precisely the type of injury that is likely to result from defendants' advertising restrictions: higher search costs and higher prices." (Id. at 6–7.) The court agrees.

Plaintiffs back up their theory of causation with multiple allegations in the CAC. According to Plaintiffs, Defendants (who together control "approximately 80% of the online retail market for contact lens sales") "committed not to compete against one another in certain critical online advertising, thereby suppressing competition and inflating the amount consumers paid for the online purchase of contact lenses from Defendants." (CAC ¶ 2.) Their allegations link the agreements to higher prices. Plaintiffs identify the agreements and the key provisions, explain how the agreements work, and explain that, under their theory, they paid overcharges and were deprived of "the total amount of truthful information about sellers of contact lenses online and about the prices of contact lenses sold online." (Id. ¶ 75; see also id. ¶¶ 1–13, 51, 58–74.)

And, in their opposition brief, Plaintiffs elaborate on the connection between the alleged injury and the agreements.

> By suppressing one of the primary ways in which they compete [i.e., online advertising], defendants purposefully made it more difficult to communicate their goods and services to consumers. This, in turn, made it less likely for defendants to compete on price, thereby stabilizing prices, diminishing competition, and causing harm to consumers.

(Opp'n at 9.)

Defendants say that Plaintiffs' CAC is inadequate in part because it does not lay out, for

---

[6]Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990), quoted in Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d 1091, 1124–25 (10th Cir. 2005).

example, prices and discounts offered by the online retailers, and because Plaintiffs' vague theory is "economically flawed on its face." (Vision Direct Mot. at 3.) But Defendants ask Plaintiffs to provide an economic analysis that requires specific data and expert testimony. That is too much to expect of Plaintiffs at this stage. "The facts necessary to show 'antitrust injury' are often very complex," and Plaintiffs should not be required to provide an expert affidavit setting out Plaintiffs' economic theory at the motion-to-dismiss stage. See, e.g., Davis v. S. Bell Tel. & Tel. Co., 755 F. Supp. 1532, 1536 n.10, 1536–37 (S.D. Fla. 1991) (rejecting argument in motion to dismiss based on plaintiffs' failure to provide a detailed economic analysis).

In addition to the CAC allegations, case law addressing advertising restrictions provides some support to Plaintiffs' argument that their theory (i.e., Defendants' advertising restrictions (even partial ones) resulted in higher search costs and higher prices for contact lenses purchased online) is plausible. In Bates v. State Bar of Arizona, 433 U.S. 350 (1977), the United States Supreme Court noted that a restriction "on advertising serves to increase the difficulty of discovering the lowest cost seller of acceptable ability. As a result, to this extent [the advertisers] are isolated from competition, and the incentive to price competitively is reduced." Id. at 377. See also Cal. Dental Ass'n v. FTC, 526 U.S. 756, 773 (1999) ("[R]estrictions on the ability to advertise prices normally make it more difficult for consumers to find a lower price and for [rivals] to compete on the basis of price."); Morales v. Trans World Airlines, Inc., 504 U.S. 374, 388 (1992) (finding that "restrictions on fare advertising have the forbidden effect upon fares"); FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 461–62 (1986) ("A concerted and effective effort to withhold (or make more costly) information desired by consumers for the purposes of determining whether a particular purpose is cost justified is likely enough to disrupt the proper

functioning of the price-setting mechanism of the market . . . ."); Realcomp II, Ltd. v. FTC, 635 F.3d 815, 830 (6th Cir. 2011) (finding that even partial advertising restrictions in an agreement among real estate brokers to restrict internet advertising were anticompetitive).

**Remoteness of the Harm**

Defendants further contend that the alleged injury is too remote. According to Defendants, the Plaintiffs allege a "downstream effect on contact lens pricing" which is too far removed from the alleged anticompetitive agreements. (Vision Direct Mot. at 17.) But Plaintiffs purchased the contact lenses directly from Defendants in the market that was allegedly restrained.[7] That is sufficient to avoid dismissal. See, e.g., Reiter v. Sonotone Corp., 442 U.S. 330, 342 (1979) ("where petitioner alleges a wrongful deprivation of her money because the price of the hearing aid she bought was artificially inflated by reason of respondents' anticompetitive conduct," she has alleged an antitrust injury); McCready v. Blue Shield of Va., 649 F.2d 228, 231 (4th Cir. 1981) (rejecting contention that patient's injury was too remote, because although alleged anticompetitive conduct was directed at psychologists, both patient and psychologists were "in the target area"); see also Trans World Airlines, 504 U.S. at 388–89 (holding that restrictions on airfare advertising directly affected airfare prices paid by consumers).

---

[7]Defendants cite to Lorenzo v. Qualcomm Inc., 603 F. Supp. 2d 1291 (S.D. Cal. 2009), and Feitelson v. Google Inc., 80 F. Supp. 3d 1019 (N.D. Cal. 2015), to support their argument that Plaintiffs' injury is too remote from the advertising practices alleged. Those cases are distinguishable because the consumers in those cases were indirect purchasers who did not participate in the markets being restrained. See Qualcomm, 603 F. Supp. 2d at 1299 (consumers "alleged injury at least three levels removed from any alleged misconduct by Qualcomm."); Google, 80 F. Supp. 3d at 1028 (finding alleged injury too remote because there was a series of supply chain levels between the defendants alleged to have engaged in anticompetitive conduct and the end consumers).

For the reasons set forth above, the court finds that Plaintiffs have sufficiently alleged that they suffered an antitrust injury as a result of Defendants' settlement agreements.

## RELEVANT PRODUCT MARKET

Under § 1 of the Sherman Act, Plaintiffs must allege that the agreements unreasonably restrain trade in the "relevant market."  TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1027 (10th Cir. 1992).  The relevant market has two components: a relevant geographic market and a relevant product market.

Here, the Defendants target the Plaintiffs' definition of the relevant product market, which Plaintiffs define as the online market for retail sales of contact lenses.  According to Plaintiffs, "[b]ecause of the ease of purchasing contacts without going to a physical store, the retail market for contact lenses sold to customers at physical locations (e.g., brick-and-mortar stores and sales by eye care professionals) exists separately from, is not an adequate substitute for, and does not restrain prices in the online market for the sale of contact lenses."  (CAC ¶ 39.)  Defendants respond that the relevant product market must include the off-line market for retail sales of contact lenses (i.e., contact lenses sold by eye care providers and "brick and mortar" businesses such as Costco and Walmart who sell the very same product provided by online sellers).

According to Defendants, the online market proposed by Plaintiffs is too narrow because the products sold by the online and offline market are identical and, further, that Plaintiffs' "bald allegations" fail to establish "that offline sales do not restrain online prices and that online sellers would profitably impose a small but significant nontransitory price increase [the SSNIP analysis used in the "hypothetical monopolist test" applied by economists]."  (Reply Br. of Vision Direct,

10

Inc., Walgreens Boots Alliance, Inc., Walgreen Co., and Luxottica Retail N. Am. Inc. (hereinafter "Vision Direct Reply") at 10, ECF No. 148.) They point out that the "Plaintiffs do not set forth any facts that establish contact lens prices, let alone identify the amount online retailers supposedly discount as compared to offline retailers." Accordingly, they argue, the CAC must be dismissed because it "provides no factual basis to infer that online prices would remain below offline prices if online sellers increased their prices." (Id. at 11.)

Typically, determination of the relevant product market is fact-intensive and not suitable for resolution at the motion-to-dismiss stage. "It is well settled that defining the relevant market is an issue of fact." Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co., 305 F.3d 1124, 1131 (10th Cir. 2002); see also, e.g., Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451, 482 (1992) ("The proper market definition in [an antitrust case] can be determined only after a factual inquiry into the 'commercial realities' faced by consumers.") (quoting United States v. Grinnell Corp., 384 U.S. 563, 572 (1966)); Lenox MacLaren Surgical Corp. v. Medtronic, Inc., 762 F.3d 1114, 1120 (10th Cir. 2014) (noting that the definition of a relevant product market "involves an issue of fact."); Todd v. Exxon Corp., 275 F.3d 191, 199–200 (2d Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.").

In limited circumstances, courts have dismissed complaints for failure to allege a relevant product market. In particular, courts have dismissed antitrust claims when the market definition was, on the face of the complaint, legally inadequate[8] or when the plaintiff made no attempt to

---

[8] See, e.g., Campfield v. State Farm Mut. Auto. Ins. Co., 532 F.3d 1111, 1118–19 (10th Cir. 2008) (the alleged product market was "inadequately pled because [the alleged conspiring

allege facts applying the requisite interchangeability test announced in <u>Brown v. Shoe Co. v. United States</u>, 370 U.S. 294 (1962).[9]  But, as discussed below, the CAC does not suffer from either of those inadequacies.

To begin the analysis of the proposed relevant product market, courts focus on "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  <u>Id.</u> at 325.  But while this general test defines the "outer boundaries of a product market," the United States Supreme Court explained that, "within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."  <u>Id.</u> at 324–25.  Then, after considering reasonable interchangeability, courts apply the "hypothetical monopolist test."

---

defendants were] not competitors, and therefore [could not] engage in a per se illegal, horizontal restraint of trade."); <u>TV Commc'ns Network, Inc. v. Turner Network Television, Inc.</u>, 964 F.2d 1022, 1025 (10th Cir. 1992) ("[A] company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product.  Consequently, [the plaintiff] has not alleged a relevant market which [the defendant] is capable of monopolizing in violation of the antitrust laws.") (internal citations omitted); <u>U.S. Gen., Inc. v. Draper City</u>, No. 2:05-cv-917-TS, 2006 WL 1594184, at *3 (D. Utah June 7, 2006) (citing <u>TV Commc'ns Network</u>, and dismissing complaint because plaintiff too narrowly defined the relevant product market as a "single [real estate] development on Traverse Mountain.").

[9]<u>See, e.g.</u>, <u>Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.</u>, No. 08-cv-513-CMA-KMT, 2009 WL 2596493, at *7 (D. Colo. Aug. 21, 2009) (dismissing complaint because there was only a "cursory mention of a relevant product and geographic market"); <u>Commercial Data Servers, Inc. v. IBM Corp.</u>, 166 F. Supp. 2d 891, 897 (S.D.N.Y. 2001) (dismissing complaint that failed to allege <u>any</u> facts or explanation supporting the proposed market);  <u>B.V. Optische Industrie De Oude Delft v. Hologic, Inc.</u>, 909 F. Supp 162, 171–72 (S.D.N.Y. 1995) ("Because a relevant market includes all products which are reasonably interchangeable, [p]laintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal.") (internal citations and quotation marks omitted).

**Reasonably Interchangeable Products**

The first step—reviewing the "reasonable interchangeability" of the product at issue (i.e., whether the product has a reasonably good substitute)—is easily determined here. There is no dispute that the products—the contact lenses— are "functionally interchangeable." Indeed, they are identical. See FTC v. Staples, Inc., 970 F. Supp. 1066, 1074 (D.D.C. 1997) (finding functional interchangeability because office supplies sold by online and offline companies were identical).

But that does not end the analysis. "Courts will generally include functionally interchangeable products in the same product market unless factors *other than* use indicate that they are not actually part of the same market." FTC v. Arch Coal, Inc., 329 F. Supp. 2d 109, 119 (D.D.C. 2004) (underline emphasis added; italics emphasis in original). Here, Plaintiffs allege "factors other than use," as discussed below, to allege a "submarket" for the online sale of contact lenses.

**Hypothetical Monopolist Test and *Brown Shoe* Practical Indicia**

At the second step, courts focus on "how far buyers will go to substitute one commodity for another" and "'the responsiveness of the sales of one product to price changes of the other.'" Staples, 970 F. Supp. at 1074 (citing and quoting United States v. E.I. du Pont de Nemours & Co., 370 U.S. 294, 400 (1956)). The courts determine this "cross-elasticity of demand" using the "SSNIP" analysis (i.e., whether the plaintiff has alleged that a small but significant (i.e., profitable) non-transitory (lasting or permanent) increase in price by the online retailers would

not result in a material loss of online customers to the offline retailers).[10]

Courts generally look "to two main types of evidence in defining the relevant product market: the 'practical indicia' set forth by the Supreme Court in <u>Brown Shoe</u> and testimony from experts in the field of economics."  <u>FTC v. Sysco Corp.</u>, 113 F. Supp. 3d 1, 27 (D.D.C. 2015).  But in a complaint, providing economic expert testimony is neither practical nor required (particularly when key data is in the defendants' possession).  Accordingly, Plaintiffs necessarily focus on the <u>Brown Shoe</u> indicia to demonstrate that their relevant product market definition is plausible.[11]  <u>See, e.g.</u>, <u>Rothery Storage & Van Co. v. Atlas Van Lines, Inc.</u>, 792 F.2d 210, 218 (D.C. Cir. 1986) (identifying <u>Brown Shoe</u> indicia as "evidentiary proxies" for proof of low cross-elasticity); <u>Sysco Corp.</u>, 113 F. Supp. 3d at 27 (same).

The <u>Brown Shoe</u> indicia include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production

---

[10]Generally speaking, if cross-elasticity of demand is low, the products are not substitutes and do not compete in the same market.  <u>Lenox MacLaren Surgical Corp. v. Medtronic, Inc.</u>, 762 F.3d 1114, 1120 (10th Cir. 2014) ("A relevant product market excludes products with low or zero cross-elasticity of demand.").

[11]Defendants fault the Plaintiffs' reliance on the <u>Brown Shoe</u> indicia.  "Unable to provide any factual allegations that support a traditional economic analysis, Plaintiffs turn to the <u>Brown Shoe</u> 'practical indicia.' But merely ticking off a handful of <u>Brown Shoe</u> factors is meaningless if those factors have no bearing on consumers' likely response to an increase in price."  (Vision Direct Reply at 11 (internal citation omitted).)  Significantly, the two cases Defendants cite to support their statement are, at a minimum, procedurally distinguishable because the courts were reviewing motions for summary judgment.  <u>See</u> <u>Reifert v. S. Cent. Wis. MLS Corp.</u>, 450 F.3d 312, 320 (7th Cir. 2006) (holding that although <u>Brown Shoe</u> indicia were "important considerations, . . . they were never intended to exclude economic analysis altogether" and granting summary judgment because plaintiff provided no expert analysis); <u>Ky. Speedway, LLC v. NASCAR, Inc.</u>, 588 F.3d 908, 919 (6th Cir. 2009) (granting summary judgment because plaintiff provided no expert testimony to define the relevant market).  Defendants essentially ask the court to apply the more stringent summary-judgment standard to their motion to dismiss.

facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized

vendors." Brown Shoe, 370 U.S. at 325.  Applying those indicia, Plaintiffs assert that "[o]nline

markets for consumer goods have long been considered to require unique pricing, sales models,

strategies, advertising methods, and distribution channels."  (Opp'n at 20.)

Plaintiffs allege that retailers of optical products recognize the online market as a separate

economic entity.  Given that "economic actors usually have accurate perceptions of economic

realities,"[12] Plaintiffs' allegations suggest a distinct online market.  According to the CAC, the

relevant economic actors (1-800 and the other defendants) view their primary competition as

online retailers.  (CAC ¶ 44 (alleging that Defendants focus primarily on their online-retailer

competition when setting price and developing customer-service offerings).)  And online retailers

tailor their advertisements to the online customer, relying "heavily on search engine advertising"

and competing for search-engine advertising space.  (Id. ¶ 45.)

Pricing and customer service offerings are tailored as well.  Online prices are materially

lower than the offline retailer prices.  (Id. ¶¶ 42–43.)  Furthermore, "[o]nline retailers' ability to

offer a unique combination of selection, depth and breadth of inventory and delivery speed"

distinguishes them from offline retailers and appeals to online customers.  (Opp'n at 22.)

Plaintiffs describe the online retailers as specialized vendors who "are able to sell contact lenses

anywhere in the United States that receives mail. . . . [and can] provide consumers the

convenience of being able to order contacts from any location without having to find a brick-and-

mortar store selling the type of contact lenses covered by their prescription."  (CAC ¶ 41.)

---

[12]FTC v. Whole Foods Market, Inc., 548 F.3d 1028, 1048 (D.C. Cir. 2008).

Additionally, Plaintiffs allege that offline retailers are not able to carry the extensive inventory offered by online retailers: "Online retailers frequently maintain a large volume of inventory across various manufacturers and brands, a fulfillment center, a customer service center, and a scale of operations to develop new customer retention tools. This allows online retailers to fulfill and ship prescriptions rapidly, unlike many brick-and-mortar retailers." (Id. ¶ 42.)

As for price sensitivity, Plaintiffs allege that "[o]line sellers of contact lenses could impose a small but significant and non-transitory increase in price without losing so many sales to brick-and-mortar stores to make the price increase not profitable." (Id. ¶ 40.) Although this is simply a recitation of the economic SSNIP test, the court may not expect anything more from Plaintiffs short of an economic analysis, which is not suitable in a complaint.

To supplement their allegations, Plaintiffs point to similar cases. In those situations, courts defined the relevant product market as a subset of competitors (i.e., specialized vendors) who, like the broader group of competitors, sold the very same product.

In FTC v. Staples, Inc., 970 F. Supp. 1066 (D.D.C. 1997), the FTC challenged the proposed merger of office superstores Staples and Office Depot. There, the defendants argued that the market consisted of all retailers of office supplies (i.e., office superstores as well as "non-superstore alternatives such as Wal-Mart, Best Buy, Quill, or Viking"). Id. at 1074. The court disagreed. Although the court noted that "the products in question [i.e., office supplies] are undeniably the same no matter who sells them," it held that the "sale of consumable office supplies through office superstores" was the relevant product market. Id. at 1080. "[T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." Id. at 1075.

16

And although distinct pricing was a significant factor in the court's decision (something the court was able to determine after an evidentiary hearing filled with data and expert analyses), the court found other distinguishing factors significant as well. After comparing the different types of retail formats, the court found that the "high volume, discount office supply chain stores "are, in fact, very different in appearance, physical size, format, the number and variety of SKU's offered [over 5,000 SKU's], and the type of customers targeted and served . . . ." Id. at 1078. The court further noted that although "Staples and Office Depot do not ignore sellers such as warehouse clubs, Best Buy, or Wal-Mart, the evidence clearly shows that Staples and Office Depot each consider the other superstores as the primary competition." Id. at 1079–80. Here, Plaintiffs' allegations track the decisive factors in Staples.

The decision in FTC v. Whole Foods Market, Inc., 548 F.3d 1028 (D.C. Cir. 2008), provides another good example. There, the FTC challenged a proposed merger between Whole Food and Wild Oats, which the court termed "premium, natural, and organic supermarkets" (PNOs). Id. at 1032. The court agreed with the FTC that the PNOs made up a submarket. Although the PNOs sold some of the same products that supermarkets sold, the court differentiated them by their intangible "non-product oriented" characteristics such as "higher levels of customer service" and a "'unique environment'" with "a particular focus on the 'core values' [their] customers espoused." Id. at 1039. These "factors other than use"[13] placed the PNOs in a submarket for antitrust purposes. As the FTC did in Whole Foods, Plaintiffs distinguish the online retail market by "factors other than use."

---

[13]FTC v. Arch Coal, Inc., 329 F. Supp. 2d 109, 119 (D.D.C. 2004).

Finally, in <u>FTC v. Cardinal Health, Inc.</u>, 12 F. Supp. 2d 34 (D.D.C. 1998), the court defined the relevant product market as the wholesale prescription drug industry, despite the fact that the wholesalers sold the same product (prescription drugs) that their competitors (e.g., drug manufacturers, or mail-order companies) sold. The <u>Cardinal Health</u> court focused not on the product (the prescription drugs) but on the services offered to consumers of that product. After asking the question whether "enough customers view other forms of prescription drug delivery methods as acceptable substitutes to the services provided by the [wholesale drug market]," <u>id.</u> at 46, the court found no reasonable substitutes for the products and services provided by the wholesale drug industry. According to the court, the industry offered "a 'unique cluster of products and services'" that "comprise[d] a distinct submarket within the larger market of drug delivery." <u>Id.</u> at 46–47. Those products and services gave customers "an efficient way to obtain prescription drugs through centralized warehousing, delivery, and billing services[.]" <u>Id.</u> at 47.

Here, as was done in <u>Staples</u>, <u>Whole Foods</u>, and <u>Cardinal Health</u>, Plaintiffs emphasize service-oriented characteristics of online contact lens retailers, the preference of their customers for those services, and the distinct "infrastructure" of the online retailers' business. Referring to online contact lens retailers as "specialized vendors," Plaintiffs assert that "[c]ustomers who shop online prefer the convenience of online shopping, home delivery and low prices. Online retailers' ability to offer a unique combination of selection, depth and breadth of inventory, and delivery speed appeals to these customers." (Opp'n at 22–23 (citing CAC ¶¶ 41–42); <u>see also</u> CAC ¶ 43 ("Pricing for contact lenses sold online typically falls below pricing for contacts sold by eye care professionals.").)

Given the market characteristics set forth in the CAC and the precedent for distinct

submarkets of competitors selling identical products, Plaintiffs have plausibly alleged that the relevant product market is the online retail market for contact lenses. In other words, Plaintiffs allege a "theoretically rational explanation" for their market definition. <u>Commercial Data Servers, Inc. v. IBM Corp.</u>, 166 F. Supp. 2d 891, 896 (S.D.N.Y. 2001). That is sufficient to avoid dismissal.

## CONSPIRACY

Defendants contend that Plaintiffs have not alleged an overarching conspiracy which, they say, is a necessary element of a Sherman Act § 1 claim. Section 1 declares that "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce" is illegal. 15 U.S.C. § 1. A "conspiracy" is only one of three types of concerted actions targeted by the Act.[14] A "contract" in restraint of trade is another. No allegation of an "overarching" conspiracy is necessary.

Here, Plaintiffs allege contracts in restraint of trade. They challenge "a series of bilateral agreements [between 1-800 and] other online sellers of contact lenses . . . ." (Opp'n at 27.) Because Plaintiffs' theory focuses on a series of bilateral horizontal agreements,[15] not an overarching conspiracy, the CAC must allege that each agreement, standing alone, unreasonably restrains trade. The CAC accomplishes that.

---

[14]"By its language, section 1 of the Sherman Act applies to three different types of conduct: contract, combination, or conspiracy. These terms have been interpreted generally to cover concerted action, or agreement by parties to act together." <u>James R. Snyder Co., Inc. v. Associated Gen. Contractors of Am., Detroit Chapter, Inc.</u>, 677 F.2d 1111, 1121 (6th Cir. 1982).

[15]"[A]greements between companies that directly compete with one another [are] called 'horizontal' agreements.'" <u>In re: Disposable Contact Lens Antitrust</u>, 215 F. Supp. 3d 1272, 1287 (M.D. Fla. 2016).

According to the CAC, the parties to each contract agreed to terms designed to restrict each other's advertising efforts: "These agreements prohibit the parties from bidding against each other in certain search advertising auctions, and obligate the parties to implement certain negative keywords – thereby precluding certain competitive, truthful, and relevant online advertisement." (CAC ¶ 58; see also, e.g., id. ¶¶ 61, 63, 68, 70, 72.) Plaintiffs then allege that "[e]ach Defendant benefitted from the agreements 1-800 Contacts entered into with other Agreeing Contact Lens Sellers by, among other things, allowing Defendants to charge supracompetitive prices to the detriment of consumers" and depriving Plaintiffs "of truthful information about competing sellers of contact lenses online." (Id. ¶¶ 59, 73.) And, finally, Plaintiffs allege the anticompetitive effects of these agreements. (See, e.g., id. ¶¶ 74–75.)

Contrary to the Defendants' contention, the CAC does allege that each individual agreement causes anticompetitive effects. That satisfies the concerted action requirement.

## STATUTE OF LIMITATIONS

A four-year statute of limitations applies to Plaintiffs' claims. 15 U.S.C. § 15b. Under that statute, Plaintiffs' claims would be limited to purchases made after October 13, 2012 (i.e., four years before the Plaintiffs filed this action on October 13, 2016). But Plaintiffs contend they were on notice of their claims no earlier than August 8, 2016, when the FTC filed its administrative action against 1-800. In other words, they avoid Defendants' statute-of-limitations defense by relying on two tolling exceptions, which would extend recovery of damages as far back as January 1, 2004: (1) equitable tolling under the fraudulent concealment rule, and (2) statutory provision tolling linked to the FTC's administrative action.

**A.    _Tolling based on Fraudulent Concealment_**

According to the CAC, Defendants' violations of the Sherman Act (and Plaintiffs'

subsequent injuries) began in January 2004, at which point the statute of limitations began to

run.[16]  But Plaintiffs say the statute of limitations was tolled because Defendants concealed the

information that gave rise to the antitrust claims "by inserting mandatory, contractual, non-

disclosure provisions in the relevant agreements."  (Opp'n at 30 (citing CAC ¶ 80).)

Under this equitable tolling doctrine, Plaintiffs must plead that Defendants used

fraudulent means to successfully conceal relevant information from consumers, and that

Plaintiffs did not know or through the exercise of due diligence could not have known that they

might have a cause of action.  King & King Enters. v. Champlin Petroleum, 657 F.2d 1147, 1154

(10th Cir. 1981).  Because this tolling rule is fraud-based, the Rule 9(b) pleading standard

applies.  In re: Nine W. Shoes Antitrust Litig.,  80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000).  "At a

minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where and how' of

the alleged fraud.'"  US ex rel. Sikkanga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702,

727 (10th Cir. 2006) (internal citations and quotation marks omitted).

The question of whether the claims were fraudulently concealed is typically factual and

not amenable to resolution on a motion to dismiss.

---

[16]See Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971)
("Generally, a cause of action [under the federal antitrust acts] accrues and the statute begins to
run when a defendant commits an act that injures a plaintiff's business."); In re: Animation
Workers Antitrust Litig., 87 F. Supp. 3d 1195, 1209–10 (N.D. Cal. 2015) (antitrust claims begin
to accrue (and the statute begins to run) when the injury occurs, not when plaintiffs should have
discovered their injuries) (citing cases, including Robert L. Kroenlein Trust ex rel. Alden v.
Kirchhefer, 764 F.3d 1268, 1275–76 (10th Cir. 2014)).

> As many courts have noted in the antitrust conspiracy context, it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly where the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators.

In re: Rubber Chems. Antitrust Litig., 504 F. Supp. 2d at 789; see also In re: Mercedes-Benz Anti-trust Litig., 157 F. Supp. 2d 355, 373 (D.N.J. 2001) ("any serious consideration of [reasonable diligence in a fraudulent concealment analysis] would take the Court well outside the boundaries of pleading").

### 1. Fraudulent Means

"[A]ny affirmative act of concealment, including those involved in the underlying violation, is sufficient" to satisfy the first element. SEC v. Kovzan, 807 F. Supp. 2d 1024, 1035 (D. Kan. 2011). To support this element, Plaintiffs allege that

> [a]t various times between 2004 and 2013, 1-800 Contacts and the other Agreeing Contact Lens Sellers entered into a series of non-public, bilateral, written agreements under which each party to the particular agreement committed to cease using or to refrain from using certain keywords for online advertising. These ongoing agreements were all kept secret from consumers, with their secrecy enforced by non-disclosure provisions in the agreements.

(CAC ¶ 12.)

Plaintiffs assert that Defendants' non-disclosure provisions are affirmative acts to conceal the true nature and anti-competitive effect of the settlement agreements. In the CAC, they quote specific nondisclosure provisions in the Defendants' settlement agreements. (See Opp'n at 30–31 (quoting CAC ¶¶ 66–72).) Then they add the allegation that 1-800 "entered into 'substantially, similar written agreements'" with other non-parties. (Id. at 31 (citing CAC ¶ 56 (listing contracting parties and dates of agreements).)

1-800 and Vision Direct entered into two settlement agreements, one in 2004 and one in

2009, and both contain non-disclosure language. The 2004 Agreement contained the following

limitation on disclosure:

> The Parties will mutually agree on press releases and/or public statements
> regarding this Agreement ("the mutually agreed PR"). Neither Party will deviate
> from the mutually agreed PR without the prior written consent of the other Party,
> which consent will not be unreasonably withheld.

(CAC ¶ 66.) The second agreement between 1-800 and Vision Direct, dated 2009, contains a

similar non-disclosure provision:

> In the event that any Party wishes to issue a press release regarding this Settlement
> Agreement, then the Parties will jointly agree on the language of such press
> release.

(May 2009 Agreement ¶ 20, ECF No. 117-2 (attached to Vision Direct's Request for Judicial

Notice, ECF No. 117).)

Following the settlements between 1-800 and Vision Direct, 1-800 entered into a

settlement agreement with AC Lens. In that March 2010 Agreement, the parties agreed

> to generally keep this Agreement confidential. The parties will mutually agree on
> any press releases and/or public statements regarding this Agreement ("the
> mutually agreed PR"). Neither Party will deviate from the mutually agreed PR
> without the prior written consent of the other Party, which consent will not be
> unreasonably withheld.

(CAC ¶ 71.)

And the June 2010 Agreement between 1-800 and Walgreens contains a complete bar:

> NONDISCLOSURE: The terms of this Agreement and the Agreement itself shall
> be held in confidence and not disclosed by any Party to any third party or any
> other person or entity without the prior express written consent of the other
> Party. . . . The Parties agree to provide prompt written notice of any request,
> demand, subpoena, Order, or any other thing that might require disclosure of the
> Agreement or any of its terms, such that the other Party shall have as much time

as possible to object to or attempt to prevent such disclosure. The Parties shall make no public statements regarding the Agreement or any of its terms. If asked by the media about this Lawsuit, the Parties shall only state that: "The matter has been resolved to the satisfaction of both parties."

(CAC ¶ 69.)

Defendants respond that a non-disclosure agreement is a standard term in settlement agreements and is not an affirmative act to conceal. But the non-disclosure provisions give Defendants a tremendous amount of discretion. The standard for disclosure is "reasonableness" as the parties choose to define it. (And the agreement between 1-800 and Walgreens provides little, if any, room to disclose any information.) What may constitute unreasonably-withheld consent is driven by factors unknown to the Plaintiffs, including motivations for including the non-disclosure provisions in the agreements. Such information is uniquely in the hands of Defendants.

Given that Plaintiffs have alleged agreements to engage in anti-competitive conduct, it is reasonable to infer that a provision requiring the contracting parties to keep the terms of that allegedly anti-competitive agreement private was an affirmative act to conceal. At this stage in the litigation, allegations identifying and quoting the nondisclosure provisions, listing names of the parties to the agreements, and providing dates of those agreements, satisfy the Rule 9(b) pleading standard and establish the first element of fraudulent concealment.

## 2. *Successful Concealment*

Plaintiffs have satisfied this element as well. They allege they did not have actual knowledge of the settlement agreements, much less the anti-competitive nature and financial harm to consumers such as themselves. And, they assert, as a result of the agreements'

nondisclosure provisions, they "were prevented from learning of the facts needed to commence suit against Defendants." (CAC ¶ 80.)

### 3. Inquiry Notice and Due Diligence Element

Defendants contend that even if Plaintiffs did not have actual knowledge, they are not entitled to tolling because they had constructive knowledge of their potential claims when the settlement agreements or the material terms of those agreements were publicly disclosed. In other words, "Defendants' public disclosures of a number of the agreements in court and SEC filings, as well as other documents in the public record disclosing the facts Plaintiffs now rely upon in their CAC, put Plaintiffs on inquiry notice of their claims." (1-800 Mot. at 15.) Defendants also emphasize the antitrust complaint filed by Lens.com against 1-800 in June 2011.[17] All of that information, they say, would have been adequate to raise Plaintiffs' suspicions about their injuries and prompt a duty to exercise reasonable diligence to uncover their claims.

Plaintiffs respond that even though the settlement agreements or some terms were disclosed in some public settings, including unsealed lawsuits, that did not amount to constructive knowledge because the information was not reasonably accessible to them as consumers, and, even if known, the content would not allow an average consumer to make the analytical leap that he may have paid artificially inflated prices for contact lenses.

_____

[17]It appears that a fair amount of the Plaintiffs' complaint is drawn from (or at least tracks) the allegations in the Lens.com complaint, but that case has a significant distinguishing characteristic: it alleges unilateral action by 1-800 and does not name any other parties. At most, Lens.com alleged that "various other persons, firms and corporations, not named as defendants herein and presently unknown to Lens, have participated as co-conspirators with 1-800 . . . ." (Lens.com Compl. ¶ 7, attached as Ex. 21 to Decl. of Ashley D. Kaplan, ECF No. 119.)

Publicly available documents may be sufficient to charge a plaintiff with constructive knowledge. For example, in cases alleging securities fraud, investors had reason to track the companies in which they invested. See, e.g., Sterlin v. Biomune Sys., 154 F.3d 1191, 1201, 1203 (10th Cir. 1998) (holding that news article in widely-read investor publication triggered investor's duty to exercise reasonable diligence); Stichting Pensioenfonds ABP v. Countrywide Fin. Corp., 802 F. Supp. 2d 1125, 1139 (C.D. Cal. 2011) (press reports and earlier-filed lawsuits placed investor on notice because "all the facts had been widely-reported"); Salinger v. Projectavision, Inc., 934 F. Supp. 1402, 1408 (S.D.N.Y. 1996) (in securities fraud case, SEC filings and press releases put investors on inquiry notice of the probability of fraud). But see Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 412, 416, 427 (2nd Cir. 2009) (holding that mainstream press reports, industry newsletters, regulatory filings, and multiple lawsuits did not provide "reasonable investor[s] of ordinary intelligence" with sufficient "storm warnings" of the probability of securities fraud by insurance company because the information was too vague and most of the publicly available information "was not reasonably accessible to the ordinary investor.").

Other cases cited by Defendants are distinguishable on their facts. For instance, the plaintiffs were organizations, significant material facts were revealed, or the information was widely disseminated through press releases, news reports, and multiple complaints. Here, Plaintiffs are individual consumers who had no reason to know about (much less understand) the antitrust implications of the settlement agreements or the disclosed terms. It would be unreasonable to expect a person making one, or even a few, discrete purchases online to research the legal actions and securities regulations involving that retailer, much less apply a complex

economic analysis to determine that the prices he paid for their product were artificially inflated. "[O]nly by operation of a legal fiction could the filing of a private lawsuit by an unrelated party in a different vicinage put consumers on notice as a matter of law that [an antitrust] conspiracy was afoot." In re: Mercedes-Benz Anti-Trust Litig., 157 F. Supp. 2d at 373–74 (a third party's earlier lawsuit did not place car purchasers on constructive notice of antitrust claim, which only became clear when details of alleged price-fixing conspiracy were outlined in *New York Times* article); see also In re: Nine W. Shoes Antitrust Litig., 80 F. Supp. 2d at 193 (shoe purchasers did not have constructive notice of antitrust claims until national media reported the alleged antitrust conspiracy).

The information provided by Defendants does not convince the court that Plaintiffs would have had ready access to the information, much less any reasonable basis to begin investigating their antitrust claims. Consequently, the Plaintiffs satisfy the final prong of the fraudulent concealment rule.

**B.** **_Tolling based on the FTC Action_**

According to Plaintiffs, the first indication that they paid artificially inflated prices appeared in the FTC's administrative complaint in August 2016. (See Opp'n at 30 ("[A] reasonably diligent investigation would not have led to the discovery of defendants' anti-competitive conduct until the FTC, which had the benefit of pre-complaint discovery, filed its [complaint against 1-800].").) But at that point, the statute was independently tolled by 15 U.S.C. § 16(i), as discussed below.

The Clayton Act tolls the statute of limitations for private antitrust actions, such as the one brought by Plaintiffs, while a government action is pending and for one year after "any civil

or criminal proceeding . . . instituted by the United States to prevent, restrain, or punish violations of <u>any of the antitrust laws</u>," provided that the private action is "based in whole or in part on any matter complained of" in the government action. 15 U.S.C. § 16(i) (emphasis added). Plaintiffs contend that, by operation of that provision, the statute of limitations was tolled when the FTC filed its complaint against 1-800.

Defendants respond that the tolling provision does not apply because "[t]he FTC administrative action was not brought 'to prevent, restrain, or punish violations of any of the antitrust laws. Rather, it was brought under Section 5 of the FTC Act, 15 U.S.C. § 45." (1-800 Motion at 11.) Although it is true that the FTC filed its action against 1-800 under § 5, it did so to enforce Sherman Act § 1. Defendants' strained interpretation of § 16(i) is not supported by the statutory language or case law. See <u>Luria Steel & Trading Corp. v. Ogden Corp.</u>, 484 F.2d 1016, 1022 (3d Cir. 1973) (holding that FTC proceedings under § 5 tolled statute of limitations for a private cause of action under Sherman Act § 1); <u>Rader v. Balfour</u>, 440 F.2d 469, 473 (7th Cir. 1971) (same); <u>In re Antibiotic Antitrust Actions</u>, 333 F. Supp. 317, 319–20 (S.D.N.Y. 1971) (same); <u>see also</u> <u>In re: Nexium (Esomeprazole) Antitrust Litig.</u>, 842 F.3d 34, 60 (1st Cir. 2016) (citing FTC Act § 5(a)(2), the court said "the FTC is empowered to directly enforce the substantive antitrust laws."); <u>Realcomp II, Ltd. v. FTC</u>, 635 F.3d 815, 824 (6th Cir. 2011) (applying Sherman Act cases to determine whether the defendant's actions violated § 5 of the FTC Act).

Given the above, the court holds that Plaintiffs are entitled to rely on the statutory tolling provision.

**ORDER**

For the foregoing reasons, the court DENIES Defendants Vision Direct, Inc., Walgreens

Boots Alliance, Inc., Walgreen Co., and Luxottica Retail North America Inc.'s Motion to

Dismiss Plaintiffs' Consolidated Amended Complaint (ECF No. 116) and 1-800 Contacts'

Motion to Dismiss Plaintiffs' Consolidated Amended Complaint (ECF No. 118).

DATED this 17th day of May, 2018.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge